# EXHIBIT A

 CT Corporation

TO: William H. Schmidt, Jr., Executive VP, General Counsel & Sec.
ENVIVA
7200 Wisconsin Ave Ste 1000
Bethesda, MD 20814-4844

RE: **Process Served in North Carolina**

FOR: Enviva Pellets Sampson, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | C. TERRY HUNT INDUSTRIES, INC., Pltf. vs. Enviva Pellets Sampson, LLC, Dft. |
| **DOCUMENT(S) SERVED:** | Letter, Summons, Return, Complaint, Exhibit(s), Attachment(s) |
| **COURT/AGENCY:** | Sampson County Superior Court, NC |
| | Case # 16CVS801 |
| **NATURE OF ACTION:** | Liens - Construction - Amount: $7,180,447.00 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Raleigh, NC |
| **DATE AND HOUR OF SERVICE:** | By Certified Mail on 07/25/2016 postmarked on 07/22/2016 |
| **JURISDICTION SERVED :** | North Carolina |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service |
| **ATTORNEY(S) / SENDER(S):** | Nancy S. Litwak |
| | HAMILTON STEPHENS STEELE + MARTIN, PLLC |
| | 201 South College Street, Suite 2020 |
| | Charlotte, NC 28244-2020 |
| | 704-344-1117 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 783660036708 |
| | Image SOP |
| | Email Notification,  Jason Paral  jason.paral@envivabiomass.com |
| | Email Notification,  Anna Martinez Chamorro  ana.martinez@envivabiomass.com |
| | Email Notification,  William H. Schmidt, Jr.  william.schmidt@envivabiomass.com |
| | Email Notification,  Ann Marie Pulsch  annmarie.pulsch@envivabiomass.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 150 Fayetteville St Ste 1011 |
| | Raleigh, NC 27601-2957 |
| **TELEPHONE:** | 919-821-7139 |

Page 1 of  1 / NM

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not of contents.



# HAMILTON STEPHENS
# STEELE + MARTIN, PLLC
### ———— ATTORNEYS AT LAW

201 S. COLLEGE STREET
SUITE 2020
CHARLOTTE, NC 28244-2020

**9314 7699 0430 0025 1247 88**
RETURN RECEIPT REQUESTED



neopost
07/22/2016
US POSTAGE $006.34

FIRST-CLASS-M

ZIP 28244
041L112514

Enviva Pellets Sampson, LLC
c/o CT Corporation System, Registered Agent
150 Fayetteville Street, Box 1011
Raleigh, NC 27601



HAMILTON STEPHENS
STEELE + MARTIN, PLLC
——————— ATTORNEYS AT LAW

**Carol Werth**
**Paralegal**
**Email: cwerth@lawhssm.com**
**704-227-1064**

July 22, 2016

***VIA CERTIFED MAIL***
***RETURN RECEIPT REQUESTED***

Enviva Pellets Sampson, LLC                    Enviva Pellets Sampson, LLC
c/o CT Corporation System, Registered Agent    Attn: General Counsel
150 Fayetteville Street, Box 1011              7200 Wisconsin Ave., Suite 1000
Raleigh, NC 27601                              Bethesda, MD 20814

      **Re:**    ***C. Terry Hunt Industries, Inc. v. Enviva Pellets Sampson, LLC***
             **Sampson County File No. 16-CVS-801**

Dear Sir/Madam:

      Enclosed for service, please find a file-stamped copy of our Summons and Complaint in the above-referenced matter.

      Thank you for your attention to this matter and please do not hesitate to contact our office if you have any questions.

                   Sincerely,

                   Carol Werth

                   Carol Werth
                   Paralegal

Encs.

# STATE OF NORTH CAROLINA

Sampson     County

FILED

2016 JUL 18 A 11: 38

SAMPSON CO., C.S.C.

BY _____

| File No. |
|---|
| 16-CVS- 801 |

In The General Court of Justice
☐ District   ☒ Superior Court Division

**CIVIL SUMMONS**

☐ Alias and Pluries Summons

G.S. 1A-1, Rules 3, 4

**Name of Plaintiff**
C. TERRY HUNT INDUSTRIES, INC.

**Address**
c/o 201 S. College Street, Suite 2020

**City, State, Zip**
Charlotte, NC 28244

**VERSUS**

**Name of Defendant(s)**

ENVIVA PELLETS SAMPSON, LLC

**Date Original Summons Issued**

**Date(s) Subsequent Summon(es) Issued**

## To Each of The Defendant(s) Named Below:

| Name And Address of Defendant 1 | Name And Address of Defendant 2 |
|---|---|
| Enviva Pellets Sampson, LLC<br>c/o CT Corporation System, Registered Agent<br>150 Fayetteville Street, Box 1011<br>Raleigh, NC 27601 | Enviva Pellets Sampson, LLC<br>Attn: General Counsel<br>7200 Wisconsin Ave., Suite 1000<br>Bethesda, MD 20814 |

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| Name And Address of Plaintiff's Attorney (If None, Address of Plaintiff)<br>Erik M. Rosenwood and Nancy S. Litwak<br>Hamilton Stephens Steele +Martin, PLLC<br>201 South College Street, Suite 2020<br>Charlotte, NC 28244-2020 | Date Issued 7-18-16 | Time 10:38 ☒ AM ☐ PM |
|---|---|---|
| | Signature *Karen Hsuea* | |
| | ☒ Deputy CSC   ☐ Assistant CSC   ☐ Clerk of Superior Court | |

| ☐ ENDORSEMENT<br><br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | Date of Endorsement | Time ☐ AM ☐ PM |
|---|---|---|
| | Signature | |
| | ☐ Deputy CSC   ☐ Assistant CSC   ☐ Clerk of Superior Court | |

**NOTE TO PARTIES:** *Many Counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $15,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

AOC-CV-100, Rev. 10/01

{00354793.DOC V. C527.023244;}

© 2001 Administrative Office of the Courts

(Over)

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name of Defendant |
|---|---|---|---|
| | | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to person named below.

Name And Address of Person With Whom Copies Left (if corporation, give title of person copies left with)

☐ Other manner of service (specify)

☐ Defendant WAS NOT served for the following reason.

| Service Fee Paid | Signature of Deputy Sheriff Making Return |
|---|---|
| $ | |
| Date Received | Name of Sheriff (Type or Print) |
| Date of Return | County of Sheriff |

AOC-CV-100, Side Two, Rev. 10/01
© 2001 Administrative Office of the Courts

{00354793.DOC V. C527.023244;}

STATE OF NORTH CAROLINA

COUNTY OF SAMPSON

C. TERRY HUNT INDUSTRIES, INC.,

Plaintiff,

vs.

ENVIVA PELLETS SAMPSON, LLC,

Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 16 CVS ___801___



**COMPLAINT**

Plaintiff C. Terry Hunt Industries, Inc. ("Plaintiff"), complaining of Defendant Enviva Pellets Sampson ("Defendant"), alleges and says:

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff is a corporation organized and existing under and by virtue of the laws of the State of Georgia and is authorized to conduct business in North Carolina.

2.     Upon information and belief, Defendant is a limited liability company organized and existing under and by virtue of the laws of the State of Delaware authorized to and conducting business in the State of North Carolina. Upon information and belief, Defendant may be served in this state by serving its registered agent, CT Corporation System, 150 Fayetteville Street, Box 1011, Raleigh, Wake County, North Carolina 27601.

3.     Defendant is the record owner of the real property discussed herein.

4.     This Court has personal jurisdiction over all parties to this action.

5.     Venue is proper in this Court pursuant to N.C.G.S. § 44A-28 and N.C.G.S. §§ 1-76 and 1-82 because Sampson County is the county in which the property at issue is located and in which the construction contract described below was performed.

{00354476.DOC V. C527.023244;}     1

## FACTUAL ALLEGATIONS

6.    Defendant is the owner of real property situated in Piney Grove Township, Sampson County, North Carolina and being further described in Paragraph 3 of the Claim of Lien on Real Property ("Claim of Lien") attached hereto as **Exhibit A**, which is incorporated herein by reference (the "Property").

7.    On or about July 22, 2015, Plaintiff and Defendant entered into a Construction Services Agreement (the "Contract") dated July 17, 2015. A copy of the Contract is attached hereto as **Exhibit B**. Pursuant to the Contract, Defendant, as owner, contracted with Plaintiff to provide concrete foundation, civil underground, mechanical installation, steel installation and other construction services to the Property, including but not limited to, labor, materials and equipment relating to the same (the "Project").

8.    Between April 2015 and January 2016, Defendant ordered, received and purchased on credit from Plaintiff various construction materials and equipment (the "Materials") which were used for the improvement of the Property, and Plaintiff performed labor (the "Labor") as part of and in constructing the Project, as described above. Together, the Labor and Materials are referred to as the "Services." In ordering and purchasing the Services, Defendant agreed to pay Plaintiff's standard prices for same.

9.    Plaintiff's last date of Services provided pursuant to the Contract was January 22, 2016.

10.   Pursuant to the Contract, Defendant agreed to pay Plaintiff for the Services; however, Defendant failed to pay Plaintiff's invoices in full as required by the Contract.

{00354476.DOC V. C527.023244;}          2

11.     The outstanding amount owed by Defendant to Plaintiff as of the filing of the Claim of Lien was $7,180,447.00, exclusive of Plaintiff's unliquidated damages on account of Defendant's wrongful termination of the Contract, plus interest at the legal rate, plus attorneys' fees pursuant to N.C.G.S. § 44A-35.

12.     Plaintiff fulfilled all of its obligations pursuant to the Contract.

13.     Defendant accepted all Services furnished by Plaintiff.

14.     On or about May 6, 2016, Plaintiff timely filed with the Sampson County Clerk of Court the Claim of Lien (16-M-50) with respect to the Property as provided by Chapter 44A of the North Carolina General Statutes.

15.     This lawsuit by Plaintiff is being timely brought within the limits prescribed by Chapter 44A of the North Carolina General Statutes.

16.     This lawsuit by Plaintiff is also brought pursuant to Section 18.5 of the Contract, which specifically preserves Plaintiff's rights or remedies under applicable law in respect of its lien rights.

**CLAIM ONE**
**(Breach of Contract)**

17.     The allegations of the above paragraphs are incorporated by reference as if fully set forth herein.

18.     The Contract is fully enforceable and valid as between the parties.

19.     Defendant has breached the Contract by, among other things, failing to pay its outstanding account balance thereunder as and when due and wrongfully terminating Plaintiff.

20.     As a result of Defendant's breaches of the Contract, Plaintiff has been damaged and is entitled to an award of its damages against Defendant in the principal

{00354476.DOC V. C527.023244;}          3

amount of $7,180,447.00, plus such damages as are shown by the evidence upon the trial of this case on account of Defendant's wrongful termination of the Contract, plus pre-judgment and post-judgment interest at the legal rate until paid in full.

**CLAIM TWO**
**(In the Alternative, *Quantum Meruit*/Unjust Enrichment)**

21.     The allegations of the above paragraphs are incorporated by reference as if fully set forth herein.

22.     Plaintiff provided Services to the Project at the request and direction of Defendant.

23.     Plaintiff expected to be paid for such Services, and this expectation was reasonable because, among other things, Plaintiff provided the Services at the express request and direction of Defendant.

24.     Defendant knew or should have known that Plaintiff expected to be paid for the Services provided.

25.     Defendant voluntarily accepted the benefits of the Services provided.

26.     Allowing Defendant to retain the benefit of the Services provided by Plaintiff without paying for them would result in unjust enrichment.

27.     Plaintiff is entitled to damages in *quantum meruit* and/or unjust enrichment in the amount of $7,180,447.00, plus pre-judgment and post-judgment interest at the legal rate until paid in full, representing the reasonable value of the Services provided by Plaintiff.

## CLAIM THREE
### (Enforcement of Lien on Property)

28.    The allegations of the above paragraphs are incorporated by reference as if fully set forth herein.

29.    As previously alleged, Plaintiff provided the Services pursuant to the Contract with Defendant for the Project, which Services constitute an improvement to the Property, as that term is defined in Chapter 44A of the North Carolina General Statutes.

30.    Plaintiff filed the Claim of Lien attached as **Exhibit A** with the Sampson County Clerk of Superior Court in the sum of $7,180,447.00, plus such damages as are shown by the evidence upon the trial of this case on account of Defendant's wrongful termination of the Contract, plus interest at the legal rate, plus attorneys' fees pursuant to N.C.G.S. § 44A-35, representing the amount owing to Plaintiff from the Defendant.

31.    Plaintiff served the Claim of Lien on Defendant as the record owner of the Property by Certified Mail.

32.    Plaintiff timely filed and served its Claim of Lien within one hundred twenty (120) days of its last date of work on the Project, which was January 22, 2016, and Plaintiff has brought this action within the statutory limitation period for the enforcement of the Claim of Lien.

33.    Plaintiff has satisfied any and all conditions precedent to filing, serving, perfecting and enforcing its lien claim pursuant to Chapter 44A of the North Carolina General Statutes.

34.    Pursuant to Chapter 44A of the North Carolina General Statutes, Plaintiff is entitled to a lien on the Property up to the amount of $7,180,447.00, plus interest at the legal rate. In the event Defendant has made further payments to Plaintiff following its

{00354476.DOC V. C527.023244;}          5

receipt of Plaintiff's Claim of Lien, Plaintiff is entitled, *inter alia*, to a lien on the Property up to the amount of $7,180,447.00 reduced to the extent of Defendant's payments to Plaintiff.

35.     Plaintiff is entitled to a judgment against Defendant enforcing Plaintiff's Claim of Lien, and for an Order that the Property be sold in accordance with Chapter 44A of the North Carolina General Statutes to satisfy Plaintiff's lien and judgment.

36.     Plaintiff is entitled to recover its reasonable attorneys' fees pursuant to N.C. Gen. Stat. § 44A-35.

37.     As previously alleged, this lawsuit is brought pursuant to Section 18.5 of the Contract, which specifically preserves Plaintiff's rights or remedies under applicable law in respect of its lien rights.


        WHEREFORE, Plaintiff respectfully prays the Court as follows:

1.     That under Claim One, Plaintiff have and recover of Defendant, the principal amount of $7,180,447.00, plus such damages as are shown by the evidence upon the trial of this case on account of Defendant's wrongful termination of the Contract, plus pre-judgment and post-judgment interest at the legal rate until paid in full and its attorneys' fees involved in its efforts to collect all monies due and owing;

2. That in the alternative, under Claim Two, Plaintiff have and recover of Defendant, the principal amount of $7,180,447.00, or such other amount as the evidence may show Plaintiff to be entitled in *quantum meruit*, plus interest at the legal rate allowed by law;

3. That under Claim Three, the Court declare that Plaintiff has a lien upon the Property, the effective date of which is May 6, 2016, in the amount of $7,180,447.00, plus such damages as are shown by the evidence upon the trial of this case on account of Defendant's wrongful termination of the Contract, plus interest as allowed by law from the date of default, and that such judgment direct that the Property be sold pursuant to Chapter 44A of the North Carolina General Statutes and that the proceeds of the sale be applied toward the satisfaction of the judgment and lien, the costs of such sale, and those of this action;

4. That under Claim Three, Plaintiff be awarded its reasonable attorneys' fees as provided by N.C. Gen. Stat. § 44A–35;

5. That the costs of this action be taxed to Defendant;

6. That all issues of fact be tried by a jury; and

7. For such other and further relief that this Court deems just and proper.

THIS the 15th day of July, 2016.

HAMILTON STEPHENS
STEELE + MARTIN, PLLC

By: _____
Erik M. Rosenwood (NC Bar # 28049)
Nancy S. Litwak (NC Bar # 47288)
201 South College Street, Suite 2020
Charlotte, NC 28244-2020
Telephone: 704-344-1117
Facsimile: 704-344-1483
erosenwood@lawhssm.com;
nlitwak@lawhssm.com
*Attorneys for Plaintiff*

# Exhibit A
## Claim of Lien on Real Property
## Sampson County 16-M-50

STATE OF NORTH CAROLINA

COUNTY OF SAMPSON



FILED

2015 MAY -6  P 2: 00

### CLAIM OF LIEN ON REAL PROPERTY

1.  **Name and address of person claiming the lien on real property:**

    C. Terry Hunt Industries, Inc.
    5420 Inner Perimeter Drive
    Valdosta, GA 31601

    C. Terry Hunt Industries, Inc.
    c/o CT Corporation System, Registered Agent
    150 Fayetteville Street, Box 1011
    Raleigh, NC 27601-2957

    Hereinafter, the "Claimant" or "Lien Claimant."

2.  **Name and address of the record owner of the real property claimed to be subject to the lien at the time the claim of lien on real property is filed:**

    Enviva Pellets Sampson, LLC
    7200 Wisconsin Avenue, Suite 1000
    Bethesda, MD 20814

    Enviva Pellets Sampson, LLC
    c/o CT Corporation System, Registered Agent
    150 Fayetteville Street, Box 1011
    Raleigh, NC 27601-2957

    Hereinafter, "Enviva Pellets" or "Owner."

3.  **Description of the real property upon which the lien is claimed:**

    BEING all that certain tract or parcel of land lying and being in Piney Grove Township, Sampson County, North Carolina and being more particularly described as follows:

    BEING ALL OF NEW PARCEL "A", containing 180.35 acres, more or less, which is described in the deed of conveyance to Enviva Pellets dated September 30, 2014, located in Map Book 1899 at Page 55 of the Sampson County Registry, and as shown on a survey entitled "BOUNDARY SURVEY FOR ENVIVA PELLETS SAMPSON, LLC," dated May 19, 2014, prepared by McKim & Creed, the original of which is recorded in Map Book 87, Page 69, in the Office of the Register of Deeds of Sampson County, SAVING AND EXCEPTING 2.02 acres as described in Book 1910 at Page 364 of the Sampson County Registry (and further described as Parcel "B" in Map Book 88 at Page 90 of the Sampson County Registry).

{00346725.DOC V. C527.023244;}

I hereby certify that I have served the parties listed in (2) and (4) above in accordance with the requirements of N.C.G.S. § 44A-11.

DATED this 5th day of May, 2016.

                        HAMILTON STEPHENS
                        STEELE + MARTIN, PLLC
                        201 S. College Street, Suite 2020
                        Charlotte, NC 28244-2020
                        Telephone: (704) 344-1117

By: _____

                        Erik M. Rosenwood (NC Bar No. 28049)
                        Nancy S. Litwak (NC Bar No. 47288)
                        erosenwood@lawhssm.com;
                        nlitwak@lawhssm.com
                        *Attorneys for Lien Claimant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the **CLAIM OF LIEN UPON REAL PROPERTY** was served pursuant to N.C.G.S. § 44A-11(b) and was deposited in the United States Mail, certified, return receipt requested, addressed to:

Enviva Pellets Sampson, LLC
7200 Wisconsin Avenue, Suite 1000
Bethesda, MD 20814

Enviva Pellets Sampson, LLC
c/o CT Corporation System, Registered Agent
150 Fayetteville Street, Box 1011
Raleigh, NC 27601-2957

This the 5th day of May, 2016.

Nancy S. Litwak

# __Exhibit B__
## Contract

# CONSTRUCTION SERVICES AGREEMENT

between

## ENVIVA PELLETS SAMPSON, LLC

and

## C. TERRY HUNT INDUSTRIES, INC.

July 17, 2015



## CONSTRUCTION SERVICES AGREEMENT

This CONSTRUCTION SERVICES AGREEMENT (the "Agreement"), made as of, 2015 (the "Effective Date"), by and between Enviva Pellets Sampson, LLC, a Delaware limited liability company (hereinafter "Owner"), and C. Terry Hunt Industries, Inc., a Georgia corporation (hereinafter "Contractor").

### RECITALS

WHEREAS, Contractor will perform the Work specified and according to the schedule in the Purchase Order according to the terms and conditions under this Agreement;

NOW, THEREFORE, for and in consideration of these premises and the agreements herein contained, the Parties, intending to be legally bound, mutually covenant and agree as follows:

### ARTICLE 1
### DEFINITION OF TERMS

This Agreement is incorporated by reference into and shall apply to the provision of the Work by Contractor described in the Purchase Order, unless specifically modified and agreed to by Owner in writing in the Purchase Order.

"*Agreement*" means this Construction Services Agreement, made as of the Effective Date, by and between Owner and the Contractor, including any attachments and exhibits hereto, and all Purchase Orders, including any attachments and exhibits thereto, all written amendments, modifications and supplements to any of the foregoing, and any and all Charge Orders.

"*Applicable Laws*" means all laws, statutes, codes, ordinances, rules, regulations, lawful orders, and other legal requirements, as amended from time to time, of all federal, state, county, and local governmental agencies and authorities that are applicable to the Work, the Site, the places where the Work is being or to be performed, the Parties or to their respective contractors or agents and, in the case of Contractor, its Subcontractors.

"*Applicable Permits*" means all valid waivers, exemptions, variances, franchises, permissions, permits, approvals, consents, authorizations, registrations, grants, acknowledgments, agreements, licenses, or similar orders of, or from, any governmental authority having jurisdiction over the matter in question, required to be obtained or maintained in connection with the planning, undertaking or performance of the Work, the facility or the Site, as may be in effect from time to time.

"*Bond*" shall have the meaning set forth in Section 5.2.3 hereof.

"*Change Order*" means a written document signed by both Parties in respect of applicable Work after the Effective Date pursuant to the provisions of the applicable Contract Documents authorizing and specifying a change to one or more Project Parameters.

"*Claims*" shall have the meaning set forth in Section 10.1(a) hereof.

2



**"*Commencement Date*"** shall have the meaning set forth in <u>Section 4.3</u> hereof.

**"*Confidential Information*"** shall have the meaning set forth in <u>Section 13.1</u> hereof.

**"*Contract Documents*"** shall mean, notwithstanding any merger or integration clause contained in any of the documents described herein, the Purchase Order, any Change Order, this Agreement and any other document identified in the Purchase Order or <u>Section 2.2</u> of this Agreement as being a "Contract Document".

**"*Contract Price*"** shall have the meaning set forth in <u>Section 4.1</u> hereof.

**"*Contractor Party Employees*"** shall have the meaning set forth in <u>Section 10.1(a)(2)</u> hereof.

**"*Contractor Personnel*"** means Contractor's employees, Subcontractors, independent contractors, agents and representatives.

**"*Contractor Taxes*"** means any and all taxes, duties, fees and contributions on or measured by the income, gross receipts or assets of Contractor or its Subcontractors and all taxes, fees and contributions on or measured by employees, other labor costs of Contractor or its Subcontractors, including, without limitation, all payroll or employment compensation tax, social security tax or similar taxes for Contractor's or its Subcontractor's employees, and all taxes, duties and fees on Subcontracts or other Contractor expenses incurred in performance of the Work.

**"*Damages*"** shall have the meaning set forth in <u>Section 10.1(a)</u> hereof.

**"*Data*"** means documents, calculations, codes, dimensions, tolerances, reports, standards, directions, information, and the like supplied by Owner to Contractor for use related to the Work.

**"*Day(s)*"** means any calendar day which is not a Saturday, Sunday or legal holiday in the Site State.

**"*Deliverable(s)*"** means all drawings, sketches, shop drawings, diagrams, illustrations, schedules, Contractor drawings, work product, and other data, information, or Materials as defined within the Contract Documents that are prepared or assembled by or for Contractor and submitted by Contractor to Owner.

**"*Documents*"** means all written, printed, or electronically produced data (including originals or reproductions) to be developed or delivered by Contractor to Owner.

**"*Effective Date*"** means the date first mentioned above.

**"*Final Acceptance*"** means the acceptance and/or approval of the Work by Owner, provided that the Work meets the requirements of the Contract Documents, and that all other contractual requirements have been successfully completed.

**"*Force Majeure Event*"** shall have the meaning set forth in <u>Section 17.12</u> hereof.

3



**"*Hazardous Material*"** means any pollutant, contaminant, solid waste, hydrocarbon product, toxic or hazardous substance or waste, any flammable, explosive or radioactive material, or any other substance, material, waste or constituent, in each case for which any duty is imposed under, cleanup is authorized pursuant to, or regulation is otherwise imposed by, any Applicable Law.

**"*Invoice Due Date*"** shall have the meaning set forth in Section 5.2 hereof.

**"*Liens*"** means any and all liens, claims, pledges, mortgages, security interests, rights of retention, charges and/or other encumbrances.

**"*Limited Notice to Proceed*"** shall have the meaning set forth in Section 4.4 hereof.

**"*LOI*"** shall have the meaning set forth in Section 17.1 hereof.

**"*Material(s)*"** means all material, equipment, products, supplies, goods, articles, processes, and documentation to be furnished by Contractor or any Subcontractor and necessary to complete the Work set forth in the Purchase Order.

**"*Notice to Proceed*"** shall have the meaning set forth in Section 4.3 hereof.

**"*Owner-furnished Data*"** shall have the meaning set forth in Section 8.3 hereof.

**"*Owner Indemnified Parties*"** shall have the meaning set forth in Section 10.1(a) hereof.

**"*Party*"** means Owner or Contractor, individually, and **"*Parties*"** means Owner and Contractor, collectively.

**"*Project Parameter*"** means the price or schedule for the applicable Work or any deadline, liability or obligation of Contractor related thereto.

**"*Prudent Industry Practices*"** means in accordance with the practices, methods and procedures used by, and the degree of skill, diligence, prudence, foresight and judgment that would reasonably be expected to be observed by, first class companies conducting work similar to the Work for similar situated counterparties in the region taking into account, as appropriate, the recommendations and requirements of vendors of Materials, and including the use of, and adherence to, practices and methods, applicable industry codes, standards and regulations, that, at a particular time, in the exercise of reasonable judgment in light of the facts known or that reasonably should have been known at the time a decision was made, would be reasonably expected to accomplish the desired results in respect of such Work, whiles safeguarding the environment, the Site, the facility (if any) and persons and entities from damage, loss or injury, in each case in a manner consistent with Applicable Laws and Applicable Permits.

**"*Purchase Order*"** means one or more documents issued by Owner to Contractor incorporating by reference this Agreement which defines among other things the scope, price, and duration of the Work and the Contract Documents and authorizing the Work.

**"*Retention*"** shall have the meaning set forth in Section 5.2.1 hereof.

4



*"Scope of Work"* shall have the meaning set forth in <u>Section 2.2</u> hereof.

*"Services"* means all of the professional services, labor, supervision, administration and other services, required to complete the Work set forth in the Purchase Order.

*"Site"* means Owner's station, office, or other location, as designated by Owner, for which the Work is intended, or to which any or all of the Work is to be delivered, as the case may be, or any other places provided or made available by Owner pursuant hereto.

*"Site State"* means the State of North Carolina.

*"Subcontract"* means an agreement, contract or commitment by Contractor with a Subcontractor for the performance of any portion of the Work, including any related purchase orders or confirmations.

*"Subcontractors"* means all vendors, suppliers, materialmen, consultants and subcontractors providing equipment, Materials or Services directly or indirectly to Contractor in connection with the Work.

*"Terms and Conditions"* means Articles 1 through 18, inclusive.

*"Work"* means all Services, Deliverables, Materials and other items and obligations that are required to be performed or provided by Contractor under the Contract Documents.

All other capitalized terms used herein shall have the meanings ascribed to them elsewhere in this Agreement.

## ARTICLE 2
## SCOPE OF AGREEMENT

2.1.  **Purchase Order and Work.**  During the term of this Agreement, following the issuance of a Purchase Order, Contractor will furnish the Work identified in the Contract Documents in accordance with the Contract Documents.

2.2.  **Contract Documents.**  The Contract Documents shall be the entire agreement by and between Owner and Contractor relating to the subject matter covered hereby.  The Contract Documents include the drawings and the following Exhibits, which are incorporated herein and known together as the "Scope of Work":

| Exhibit No. | Description |
| --- | --- |
| 1 | Scope of Work |
| 1A | Addendum 1 |
| 1B | Addendum 2 |
| 1C | Clarifications |
| 1D | Reserved |
| 2 | Schedule of Values with Progress Payment Values |
| 3 | Schedule |



| 3A | Progress Milestone Schedule |
|---|---|
| 4 | Form of Notice of Final Completion |
| 5 | Enviva QA-QC Checklist Forms |
| 6 | Notice to Proceed |
| 7 | Contractor Daily Construction Report |
| 8 | Owner Minimum Project Site Safety Requirements |
| 9 | Form of Change Order |
| 10 | Form of Interim Lien Waiver |
| 10A | Form of Subcontractor Interim Lien Waiver |
| 11 | Form of Final Lien Waiver |
| 12 | Billing Instructions |
| 13 | Reserved |
| 14 | Notice of Mechanical Completion |
| 15 | Reserved |
| 16 | Reserved |
| 17 | List of Key Personnel |
| 18 | Subcontractor List |
| 19 | Form of Contractors Payment Request |
| 20 | Reserved |
| 21 | Contractor Safety Plan |
| 22 | List of Drawings used for Bid |
| 23 | Exhibit 1 Scope Changes |
| 24 | Exhibit 1A Addendum 1 Changes |

2.3.   **Acceptance of Terms.**  This Agreement shall govern the relationship between Owner and Contractor regarding the performance of the Work.  Unless otherwise agreed to in writing, formation of a binding agreement between the Parties is conditioned upon Contractor's acceptance of each and every term in the Contract Documents including but not limited to this Agreement.  Contractor's express acknowledgement of the Purchase Order, or Contractor's performance of any portion of the Work, shall constitute acceptance by Contractor of each and every term of the Contract Documents.

2.4.   **Priority of Terms.**  All component parts of the Contract Documents are listed below in order of priority, with the document having the highest priority listed first and the one with the lowest priority listed last.   All of the Contract Documents are intended to be complementary and should be read as a whole and their provisions construed accordingly.  In the event of inconsistency or conflict between them, the document with the higher priority shall control.  In the event of a conflict or inconsistency between provisions contained with the same document, then the provision that requires the highest standard of performance on the part of Contractor shall control.  The component parts of the Contract Document in order of priority are as follows:

A.   Change Orders;
B.   these Terms and Conditions;
C.   Exhibits 1, 1A, 1B, 1C, 1D, 2, 3A and 3;

6



2.5. **Contractor Proposals and Related Documents.** Contractor's proposals, bids, and/or Contractor's terms and conditions shall not be part of the Contract Documents.

## ARTICLE 3
## CONTRACTOR'S RESPONSIBILITIES

3.1. **General Responsibilities.** During the term of the Contract Documents, Contractor shall have the following responsibilities:

3.1.1   Perform the Work in accordance with all Applicable Laws, Applicable Permits and Prudent Industry Practices pursuant to the terms of the Contract Documents by furnishing all necessary management, supervision, equipment, tooling, Material and technical and other qualified personnel necessary for the timely prosecution of the Work.

3.1.2   Appoint one or more individuals who shall be authorized to act on behalf of Contractor as a primary point of contact under the Contract Documents and with whom Owner may consult with at all reasonable times, and whose instructions, requests and decisions will be binding upon Contractor as to all matters pertaining to the Contract and the performance of the Work.

3.1.3   Provide Owner with all Deliverables, reports, analyses and/or other documents as directed by Owner at intervals and periods required under the Contract Documents or as otherwise consistent with maintaining the schedule in form and substance acceptable to Owner.

3.1.4   Contractor shall carry on the Work in accordance with the Contract Documents during any dispute between itself and Owner unless otherwise directed by Owner.

3.2. **Safety.** Contractor shall take all necessary measures to protect its employees, Subcontractors, agents, representatives and others at the site where the Work is conducted, including but not limited to maintaining a safe, clean, and secure work area. Contractor is responsible for furnishing its employees with any and all necessary or mandated safety equipment, including but not limited to ladders, scaffolds, barricades, and other fall protection. Contractor shall comply with all Applicable Laws and Applicable Permits in maintaining a safe and hazard-free work area. Contractor shall take all necessary measures, whether or not mandated by law, to assure the safety of its employees, Subcontractors, agents and representatives and others in the work area and to prevent any adverse impact to or contamination of the environment. Contractor shall at a minimum comply with the "Owner Minimum Project Site Safety Requirements" which are included in the Contract Documents. Contractor shall, at Owner's request and sole discretion, immediately remove any Contractor Personnel or Subcontractors from the Site for failing to follow Applicable Laws, Applicable Permits or Owner's safety requirements.

3.3. **Independent Contractor.** Contractor is an independent contractor with respect to Owner and neither Contractor nor its employees nor any employees of its Subcontractors shall be deemed to be the servants, employees, or agents of Owner. Contractor shall neither act, purport to act nor represent itself as Owner's agent or representative for any purpose whatsoever.

7



Contractor's and each Subcontractor's employees shall have no right to make any claim under any Owner employee plan or benefit program and Contractor shall defend, indemnify and hold Owner harmless for claims, suits and other liabilities resulting therefrom.

3.4. **Contractor Personnel and Subcontractors.**

(a)     Contractor will request from Owner the clearance of Contractor Personnel prior to their entrance onto Owner property or access to any Owner systems. Contractor will supply all reasonable information requested by Owner regarding such Contractor Personnel. Owner, at its sole discretion, may (i) determine whether to and whom to grant any clearance or access; (ii) request the removal and replacement of any Contractor Personnel provided by Contractor to perform the Work; or (iii) revoke access to Owner property or systems. Contractor will promptly comply with such request and not use such Contractor Personnel again to perform the Work. Contractor will provide Owner with Owner approved replacements at no additional cost to Owner and in a timely fashion so as not to impact the performance of the Work.

(b).     If key personnel are designated in this Agreement, Contractor will assign them to the Work prior to the commencement of the Work at such other time as otherwise agreed in writing by Owner. Once assigned, they will not be removed, replaced, or reassigned by Contractor without Owners' prior written consent (not to be unreasonably withheld in the case of personal reasons). If any key personnel become unavailable for reasons beyond Contractor's control, Contractor will immediately notify Owner, submit justification in sufficient detail to permit evaluation of the impact on the Work, propose a replacement person if appropriate and secure the prior approval of Owner for any replacement.

(c)     Contractor will only use its employees to perform the Work unless Owner consents to the use of Subcontractors in advance in writing. If Owner consents to such use, every Subcontract will include, at a minimum, contract provisions that preserve and protect the rights and remedies of Owner pursuant to this Agreement, and provide Contractor with protections at least equal to that provided by this Agreement. Contractor shall be responsible and liable for the performance of Work and any acts or omissions of its Subcontractors under this Agreement as if such Work, acts or omission were those of Contractor. Contractor will (i) designate Owner as a third party beneficially of all contracts with such Subcontractors and (ii) ensure that each Subcontract is by its terms assignable to Owner at Owner's option in the event of any termination by Owner of this Agreement for cause.

3.5. **Damage to Property.** . Contractor will not interfere with, disconnect, destroy, damage or otherwise disturb Owner work or property (included data and systems) without first obtaining Owner's written consent (which may be granted or withheld in its sole discretion). Contractor will reimburse Owner for the cost of replacement or repair of Owner work or property (including data or systems) destroyed or damaged as a result of the acts or omissions of Contractor Personnel. Contractor shall at all times during Contractor's performance of Work be responsible for the protection of, and any removal, salvaging, replacement and/or relocations of, any and all electric lines and poles, telephone lines an poles, highways, bridges, waterways, railroads, sewer lines, natural gas pipelines, drainage ditches, culvers and any and all property of third parties from damage as a result of the performance of the Work. Except to the extent that the Scope of Work expressly permits Contactor to effect such removal, salvaging, replacement and/or relocation,

8



Contactor shall obtain written approval of Owner (such approval not to be unreasonably withheld or delayed) prior to effecting (or permitting any Subcontractor to effect) any such relocations. Where ingress and egress to and from the Site or lands is made by any Contractor Personnel in connection with the Work, Contractor shall avoid damaging such property. In the event that any such property is damaged or destroyed by an act or omission of, or traffic due to, Contractor Personnel, Contractor shall at Contractor's sole unreimbursed expense, promptly rebuild, restore or replace such property.

**ARTICLE 4**
**PAYMENT FOR WORK**

4.1.    **Contract Price.** In consideration for delivery of acceptable Work, Owner shall pay and Contractor shall accept, as Contractor's entire compensation for the Work, the amount set forth in the Purchase Order and any applicable Change Orders thereto (collectively, the "**Contract Price**"). Owner shall not be obligated to compensate Contractor or any other party for Services, parts or Materials provided under the Contract Documents unless specified in a Purchase Order signed by an authorized representative of Owner and acknowledged by Contractor. Unless otherwise expressly provided in the Purchase Order, the Contract Price shall be a fixed price and include all costs associated with performance of the Work, including but not limited to labor and associated employment benefits, Materials, parts, transportation and delivery charges, insurance, travel and living expenses and all other fees, duties or charges. If the Purchase Order specifies payment on a unit-price basis with respect to any Work, Owner shall, unless otherwise expressly agreed by the Parties, compensate Contractor in accordance with the applicable unit-price rates set forth in Exhibit 2 hereto for such Work. If the Purchase Order specifies payment on a time and materials basis with respect to any Work, the Contractor shall provide an estimate of the maximum Contract Price with respect to such Work and, unless otherwise agreed upon in the Contract Documents, Contractor shall not be entitled to any payment in excess of such estimated maximum amount except upon Owner's prior written consent (which may be granted or withheld in Owner's sole discretion), and Contractor shall be obligated to complete such Work in accordance with the terms of the applicable Contract Documents. Contractor shall be liable for and shall pay all compensation to its employees and shall be liable for and pay all Contractor Taxes, contributions, penalties or other costs or charges imposed by law.

4.2.    **Sales Tax.** The Contract Price shall include sales or similar taxes applicable to the Work; however, any sales or similar taxes applicable to the Work shall be listed separately by Contractor. Owner agrees to pay or reimburse Contractor any such taxes applicable to the Work. As applicable, Owner shall furnish Contractor a copy of any direct pay permit, tax exemption certificate or any similar evidence of exemption with respect to such tax, and in such event Contractor shall not bill or otherwise charge Owner for any such tax.

4.3.    **Commencement of the Work.** Except for such Work the performance of which commences prior thereto pursuant to Section 4.4 hereof, Contractor shall commence performance of the Work on the date which Owner specifies (the "**Commencement Date**") in a written notice delivered to Contractor (the "**Notice to Proceed**"). In the event that the Commencement Date does not occur on or prior to the date listed in the Contract Documents, then the schedule, milestones and, as appropriate, any other calendar dates set forth in this Agreement that may be affected thereby, shall each be extended on an equitable basis as reasonably determined by Owner,

9



but in no event by more than one (1) day for each day following such date before the Commencement Date occurs.

**4.4. Limited Notice to Proceed.** Prior to the Commencement Date, Owner may issue one or more limited notices to proceed, in a written limited notice to proceed delivered to Contractor (each, a "**Limited Notice to Proceed**"), for such portions of the Work, and pursuant to the terms and conditions, set forth therein and no Limited Notice to Proceed shall affect the Contract Documents, the schedule, milestones or any other calendar dates set forth in this Agreement (unless expressly set forth in such Limited Notice to Proceed). Contractor will be paid in accordance with the terms of the applicable Limited Notice to Proceed for the pre-Commencement Date Work actually performed under such Limited Notice to Proceed.

**4.5. Pre-Commencement Date Termination or Suspension.**

(a)      Notwithstanding any provision in this Agreement to the contrary, if this Agreement were to be terminated by Owner pursuant to Article 12 hereof prior to the occurrence of the Commencement Date, the total cancellation costs that Owner shall be responsible for hereunder in connection with the Work undertaken by Contractor, if any, shall be equal to the cancellation charges that are specified to be due and payable pursuant to (and subject to the limits set forth in) the terms and conditions of each Limited Notice to Proceed; *provided, however,* that costs incurred by Contractor in connection with items procured by Contractor shall not be included in such cancellation charges until Contractor shall have delivered to Owner (or to Owner's designee, which may be any affiliate of Owner or any third party purchaser, provided that such assignment is consistent with the provisions of Section 17.3 hereof) all documents necessary to transfer all of Contractor's right, title and interest in and to such items to Owner (or such designee) and, with respect to such items which Contractor has received possession of, Contractor shall have delivered such items to Owner (or such designee), in each case free and clear of all Liens made by, through or under Contractor or any Subcontractor (subject to Owner's payment of the cancellation charges due under the Limited Notice to Proceed). Contractor shall use all reasonable efforts to minimize any cancellation charges under this Section 4.5.

(b)      Except as set forth in Sections 4.4 or 4.5(a) hereof, Owner shall have no other payment or reimbursement obligation to Contractor with respect to Contractor's performance of Work prior to the Commencement Date hereunder, and Contractor hereby acknowledges and agrees that all costs and expenses incurred by Contractor (other than those covered by Section 4.5(a) hereof) in performing the Work hereunder prior to the Commencement Date will be at its own risk and expense and that it hereby waives any and all rights to require any payment therefor from Owner, whether arising hereunder, at law or in equity, except as expressly set forth in Sections 4.4 or 4.5(a) hereof.

**ARTICLE 5**
**INVOICES**

**5.1. Content of Invoices.** On the first (1st) and fifteenth (15th) day of every month Contractor shall submit to Owner a progress payment invoice covering Work completed during the semi-monthly period just ended, for its review and approval. The progress payment invoice must include and be supported by documentation, explanation and any other information necessary

10



to substantiate, to Owner's satisfaction, all amounts being invoiced for the applicable period. As applicable to the particular scope of Work, the progress payment invoice must, at a minimum, provide the following:

5.1.1 **General.** Owner's Purchase Order number, invoice number, date of invoice, period covered by the invoice, and period and cumulative cost summaries.

5.1.2 **Direct Labor.** If on a time and materials basis, total number of hours worked, broken down by task, equipment, material, supplies and individual, the total labor costs by task breakdown including overhead and fee, if applicable, as well as the appropriate individual's name, job classification and applicable rate being invoiced. If on a unit-price basis, the total number of units completed, the applicable unit rate(s) being invoiced and the total unit compensation being invoiced.

5.2. **Payment of Invoices.** Upon Owner's request, Contractor shall furnish such further supporting documentation as Owner may reasonably require to address Owner's concerns over any progress payment invoice. Disputed progress payment invoices shall be resolved in accordance with Section 5.3 below. A payment made by Owner hereunder shall not constitute a release or waiver by Owner of any claims against Contractor, known or unknown. Unless otherwise agreed upon in writing, Owner shall (subject to its withholding, set-off and retention rights hereunder) pay the undisputed amount due Contractor in respect of the Work due Contractor within thirty (30) days from receipt of a true and correct invoice, together with all required supporting documentation, complying with the requirements of this Agreement (the "**Invoice Due Date**"). Interest at the lower of (i) the rate of 1.5% per month and (ii) the highest rate permitted by applicable law shall be due and payable on the amount of any undisputed portion of an invoice not paid within thirty (30) days of the Invoice Due Date, from the thirty-first (31st) day after the Invoice Due Date until the balance is paid to Contractor. Invoices that are not true and correct may be adjusted and paid as adjusted or returned to Contractor for correction and resubmittal. No interest, carrying charges or other penalty will be incurred or paid on any unpaid or adjusted invoice except as expressly set forth in this Section 5.2. Owner shall have no obligation to pay any invoice which Contractor submits pursuant to this Article 5 until Contractor has executed and returned to Owner an acknowledgement copy of the Purchase Order and any Change Orders, if applicable, for the Work. Unless otherwise agreed upon in writing, Contractor shall submit all invoices no later than forty five (45) days after performance or delivery of the Work being invoiced. Owner shall not be obligated to pay any invoices submitted after such period.

5.2.1 **Retention.** Owner shall withhold from each progress payment due to Contractor hereunder, other than the final payment in connection with achievement of Final Acceptance, an amount equal to five percent (5%) of such payment, which shall be held by Owner as retention ("**Retention**") (without obligation to invest those monies or to account for interest thereon or to place them in a designated account) and paid to Contractor in accordance with Section 5.2.2. Owner shall have the right to draw on any Retention in the event that any payment payable by Contractor hereunder is overdue. In the event that Owner makes any draw on any Retention, it shall use and apply the amount so drawn toward satisfying the relevant overdue obligation of Contractor.

11



5.2.2 **Return of Retention.** Contractor may invoice Owner for the return of the Retention, or permitted portion thereof, in accordance with the terms of this Agreement in connection with the final payment in respect of the achievement of Final Acceptance.

5.2.3 **Payment and Performance Bond.** Contractor shall furnish a payment and performance bond that (a) shall be in place on or prior to the date on which Contractor mobilizes to the Site, (b) shall be assignable by Owner, (c) shall be in form and substance (including as to premium), and issued by a surety, reasonably acceptable to Owner, (d) shall be for the full Contract Price and (e) shall be valid through Final Acceptance with respect to all Work (such payment and performance bond, the "**Bond**"). Owner shall reimburse Contractor for the premium payable from time to time with respect to such bond as part of Contractor's progress payment invoices submitted in accordance with Section 5.2.

5.3. **Withholding Payment.** Owner may, in addition to any other rights under this Agreement, withhold payment of all or a portion of any invoice as and to the extent as may be reasonably necessary to protect Owner from loss due to:

(a) The costs incurred by Owner in correcting defects, deficiencies or non-conformities with any of the warranties set forth in Section 6.1 not remedied by Contractor in accordance with Article 6;

(b) Cost incurred by Owner for the discharge or removal of Liens filed in connection with the Work by Contractor, Subcontractors or any other person or entity acting through or under any of them, which Contractor fails to timely discharge; and

(c) Owner's claims for damages, including but not limited to, indemnity payments and liquidated damages payable by Contractor in accordance with this Agreement.

5.3.2 **Disputes over Invoices and Withholding Payment.** Any disputes regarding amounts due under a progress payment invoice, or amounts withheld by Owner under this Section 5.3.2, shall be handled in accordance with the procedure set forth in Article 18. During the pendency of any such dispute and the resolution thereof, Contractor shall continue to expeditiously perform the Work unless otherwise directed by Owner.

5.4. **Lien Waivers.** Contractor shall timely pay all Subcontractors who have done Work or furnished Materials in connection with Work performed pursuant to a Purchase Order. Contractor shall cause any and all Liens filed against the Work to be removed immediately. Contractor shall indemnify Owner to the maximum extent allowed by law, against any and all claims or Liens asserted against Owner (except in the case of non-payment by the Owner) by any Subcontractor who has done Work or furnished Materials for the Work pursuant to a Purchase Order and shall be liable to Owner for any attorney fees incurred by Owner as a result of such claims for amounts which Contractor has been paid. Invoices shall be accompanied by waivers and releases of lien forms signed by Contractor and Subcontractors for which reimbursement is sought as a part of the applied for invoice payment. If any Subcontractor fails to furnish a release and waiver required, in lieu thereof Contractor shall immediately (and as a condition precedent to any obligation of Owner to pay an invoice) furnish a bond, in form and substance reasonably satisfactory to Owner, fully indemnifying Owner against any loss resulting from any and all

12



claims, Liens, encumbrances, security interests or other interests of such Subcontractor that would otherwise have been subject to such release and waivers.

5.5. **Right to Backcharge.** Contractor shall reimburse Owner for the reasonable costs actually incurred by Owner for workarounds or other changes caused by Contractor's acts or omissions under this Agreement including, but not limited to, (a) Contractor's changes to the Schedule, (b) Contractor's changes to Deliverables that had been previously delivered to Owner, (c) completion by Owner of any of the Work or (d) rework of any Work performed by or on behalf of Owner.

5.5.1 **Invoices for Backcharges.** Owner shall submit a supplemental invoice for such costs and such invoices shall be due and payable monthly in arrears.

## ARTICLE 6
## CONTRACTOR'S WARRANTY

6.1. **Warranties of Contractor.** Contractor warrants that the Work shall be (a) free from defects and in conformance with the Contract Documents, new (unless otherwise specified in the Contract Documents) and free and clear of any Liens; (b) true, accurate and correct; (c) in compliance with all Applicable Laws and Applicable Permits; (d) performed by qualified and professional individuals with a degree of skill and care which shall be, at a minimum, consistent with Prudent Industry Practices; and (e) fit to serve its intended purpose and function as required in the Contract Documents. Contractor further warrants that it is properly organized and in good standing to do business in the state where the Work is to be performed; it has the right and all authorizations necessary to enter into the Contract Documents and perform the Work; and it will comply with all Applicable Laws and Applicable Permits. Contractor's warranties under this Section 6.1 shall be in effect for a period of (i) one (1) year from the date of Final Acceptance (or any earlier termination of this Agreement) or (ii) twenty four (24) months after the date of delivery or performance, whichever occurs first. These warranties shall not in any way limit any standard warranties provided by Contractor to its customers generally. Contractor will take all steps necessary to pass through any third party warranties provided in connection with the Work. In the case of any correction, addition, repair or replacement during the applicable warranty period, but only with respect to such correction, addition, repair or replacement, the applicable warranty period shall end on the later of (i) the expiration date of such warranty period or (ii) the date that is twelve (12) months after the date of such correction, addition, repair or replacement.

6.2. **Owner's right to Remedy Non-conforming Work.** If any of the Work does not comply with any of the warranties set forth in Section 6.1 and Owner provides Contractor notice of such non-compliance, then Contractor shall (at its sole cost and expense) promptly replace, re-perform or repair the non-conforming Work such that it conforms with all of such warranties, or promptly refund the portion of the Contract Price attributable to such non-conforming Work, at Owner's option in its sole discretion. Contractor shall also assume the cost of repairing, replacing or correcting defective, deficient or damaged equipment, Materials or structures purchased or built in reliance upon designs, plans, drawings or specifications which fail to comply with any of Contractor's warranties. In the event that any non-conforming Work materially affects the completion, operation or use of any of the Work or the facility or presents an imminent threat to the safety or health of any person or affects (or could reasonably be anticipated to affect) the

13



facility's compliance with any Applicable Law or Applicable Permit, Owner may in its sole discretion, without giving prior notice to Contractor or affording Contractor any opportunity to take any action to re-perform, repair or replace such non-conforming Work, perform correctly, repair and/or replace such non-conforming Work and perform any or all of Contractor's obligations under Section 6.1 and this Section 6.2 in respect of such non-conforming Work and promptly recover from Contractor (directly or, at Owner's option, through exercise of set-off rights) all of its costs and expenses in connection therewith.

      6.2.1  Contractor shall promptly notify Owner after any Work that does not comply with any of the warranties set forth in Section 6.1 is discovered by Contractor. Owner shall use its reasonable efforts to promptly notify Contractor after any Work that does not comply with any of the warranties set forth in Section 6.1 becomes apparent to Owner; *provided, however*, that the failure of Owner to so notify Contractor shall not relieve Contractor from any of its obligations under this Article 6 or any other provisions of this Agreement.

      6.3.    EXCEPT AS SET FORTH IN THE CONTRACT DOCUMENTS, CONTRACTOR MAKES NO OTHER WARRANTIES EXPRESS OR IMPLIED RELATING TO CONTRACTOR'S WORK. THE PARTIES HEREBY AGREE THAT NOTWITHSTANDING THE FOREGOING, NOTHING IN THIS SECTION 6.3 SHALL IN ANY WAY LIMIT, EXTEND OR OTHERWISE AFFECT CONTRACTOR'S OTHER OBLIGATIONS AND LIABILITIES HEREUNDER, INCLUDING, WITHOUT LIMITATION, (A) CONTRACTOR'S OBLIGATION TO COMPLETE ALL OF THE WORK (AS DEFINED HEREIN) IN ACCORDANCE WITH THE PURCHASE ORDER AND TO CAUSE THE WORK TO COMPLY WITH ALL APPLICABLE LAWS, ALL APPLICABLE PERMITS AND THE CONTRACT DOCUMENTS, (B) CONTRACTOR'S LIABILITY FOR WILLFUL BREACH OF ITS OBLIGATIONS UNDER THIS ARTICLE 6 AND (C) CONTRACTOR'S OBLIGATIONS UNDER ARTICLE 10 HEREOF.

**ARTICLE 7**
**CONTRACT CHANGES**

      7.1.    **General.**  The Contract Documents may not be changed, altered, modified or discharged except by a Change Order issued pursuant to this Agreement and executed by the Parties in accordance with this Article 7 or by an amendment executed in accordance with Section 17.2.

      7.2.    **Change Procedure.**  Owner shall have the right to initiate changes in the Work, through a Change Order. If any Owner-ordered change results in an increase or decrease in Contractor's cost or time for performing the Work and such cost or time of performance is not expressly addressed in the applicable Change Order, a reasonable equitable adjustment shall be made in the Contract Price or the Work schedule as may be so affected, and the Contract Documents shall be modified in writing accordingly. Contractor may request changes in the Work only in the event the changes are not attributable to Contractor's failure to perform the Work for the Contract Price or on time in accordance with the schedule or to Contractor's breach of this Agreement. Contractor shall submit all requests for changes in the Work in writing to Owner for its approval. Upon receipt thereof, Owner shall review the proposed change for consistency with

14



Owner's objectives, and its impact upon the Work schedule and the Contract Price. No change in the Work or Contract Documents terms shall bind the Parties until Owner and Contractor execute and acknowledge respectively a Change Order setting forth the terms of any such change or amendment, including but not limited to any adjustment in the Contract Price, if not provided under the Contract Documents, and any adjustment to the Work schedule.

    7.2.1  The Owner "Change Order Form" attached hereto in <u>Exhibit 9</u> shall be used for all requests from the Contractor for changes in the Work.

    **7.3.**  **Documentation of Changes.**  Owner shall prepare and issue to Contractor for execution a written Change Order consistent with <u>Section 7.2.1</u> which will specify the manner in which the Contract Documents are to be modified. Upon execution by Owner and Contractor of such Change Order, the Contract Documents shall be deemed amended in accordance with the terms of such Change Order. Any Work which Contractor performs that is not in compliance with the terms of the Contract Documents or an executed and acknowledged Change Order is performed at Contractor's sole risk, cost and expense without liability to Owner.

    **7.4.**  **Contractor's Proposals or Requests for Changes.**  Should Contractor insert, provide or include with its acknowledgement of any Purchase Order or Change Order or in any other notice or writing, terms and conditions which supplement or conflict with the terms of the Contract Documents or the original of such Purchase Order or Change Order, then the supplemental or conflicting terms and conditions shall be null, void and shall have no force and effect as between Owner and Contractor, unless such supplemental or conflicting terms are set forth in a separate Change Order that is executed and acknowledged by Owner.

**ARTICLE 8**
**SCHEDULE, DELIVERABLES; DOCUMENTS**

    **8.1.**  **Acceleration; Schedule Recovery.**  Owner may by written notice and at Contractor's sole unreimbursed cost, require Contractor to accelerate the progress of the Work and/or submit a schedule recovery plane for Owner's approval in the event that Owner determines that Contractor has not made adequate progress toward completion of the Work or attainment of any milestone based on Contractor's falling behind the schedule in the Contract Documents. Such acceleration measures that may be ordered by Owner include, without limitation, Contractor's supplying (or causing one of more Subcontractors to supply) additional labor (including, but not limited to, overtime (including weekends), additional shifts and additional supervisors).

    **8.2.**  **Liquidated Damages.**  Contractor and Owner recognize that time is of the essence of this Agreement and that Owner will suffer financial loss if the Work is not completed within the times specified, plus any extensions of time allowed by the Agreement. The Parties also recognize the delays, expense, and difficulties involved in proving in a legal or arbitration proceeding the actual loss suffered by Owner if the Work is not completed on time. Accordingly, instead of requiring any such proof, Owner and Contractor agree that as liquidated damages for delay (but not as a penalty), Contractor shall, following seven (7) Days written notice from Owner to Contractor pay Owner the amount specified in this <u>Section 8.2</u> for each day that expires after the time specified for completion of the Work required for the applicable milestone until such

15



Work is actually completed for the applicable milestone  Owner shall provide written notice of milestone dates seven (7) days prior to the milestone date for each area.  Any and all liquidated damages shall be paid by Contractor or, at Owner's sole discretion, may be set-off against any amount otherwise due Contractor hereunder.  Contractor shall pay liquidated damages in arrears within fifteen (15) days of receipt of an invoice from Owner.  Owner's invoice for liquidated damages shall specify the amount due and shall include reasonable calculations on the basis of which such amount has been determined.  The liquidated damages shall be determined based on the following: ～

For each day that the Work required for the applicable milestone occurs after the date by which completion of the Work for such applicable milestone was guaranteed to have occurred under the Contract Documents, Contractor shall be obligated to pay liquidated damages equal to One thousand five hundred United States dollars ($1,500.00) per day for each day of delay of with respect to that particular milestone; *provided*, *however*, the maximum amount of liquidated damages for which Contractor may be liable under any Purchase Order shall not exceed ten percent (10%) of the Contract Price.

For purposes of this Section 8.2, applicable milestones are completion of all Work with respect to the Mechanical Completion milestone dates set forth in Exhibit 3A and denoted with an asterisk.

    8.3.    **General.**  Contractor agrees all Deliverables and Documents resulting from the Work will be considered "work for hire" and that title and all rights and legal interests, including copyright and "moral" rights, in all such work product prepared, procured, or produced in the performance of the Work (whether actually delivered to Owner or not) shall vest solely and exclusively in Owner and Contractor will take any actions necessary to vest in Owner such rights. To the extent Contractor acquires any rights in any such Deliverable or Document, Contractor hereby assigns those rights to Owner.  Owner may use information contained therein for any purpose whatsoever.  If so specified in the Contract Documents, Owner will furnish to Contractor all Data, specifications, schedules, procedures, and other information relating to the Work in a form and medium chosen by Owner ("**Owner-furnished Data**"), indicating necessary locations, elevations, arrangement of apparatus, design details of installation, maintenance, construction, and including such information as is available for performing the Work.  All Owner-furnished Data shall remain Owner's exclusive property.  Contractor shall not use Owner-furnished Data for any purpose other than for the Work and shall maintain the confidentiality of Owner-furnished Data in accordance with the confidentiality provisions hereof.  Contractor shall be responsible for the safekeeping of Owner-furnished Data and shall return such Owner-furnished Data and all Deliverables, Materials, work product, notes, work papers and the like prepared in connection with or related to the Work and all copies of the foregoing to Owner upon completion of the Work or termination of the Contract Documents or sooner if so requested by Owner.  Contractor shall use the most recent technical data and other information that Owner has furnished, or caused to be furnished by others, for use in performing the Work after reviewing such information for reasonable accuracy and compatibility with the Work.  If such information and applicable codes and standards are inconsistent or conflicting, the Work shall comply with the more stringent requirements.

16



# ARTICLE 9
## AUDIT AND MAINTENANCE OF RECORDS

9.1. **General.** Contractor shall, for at least three (3) years after expiration of the warranty period or any earlier termination of this Agreement or for such longer period as may be required by Applicable Laws, Applicable Permits or the Purchase Order, maintain full and complete records relating to Contractor's performance of the Work and any charges invoiced to Owner related thereto. Owner has the right at any time, with reasonable notice, during the performance of the Work and for three (3) years following expiration of the warranty period or any earlier termination of this Agreement, and at Owner's expense to audit Contractor's books and records insofar as they pertain to charges invoiced to Owner related to Work performed on a time and materials basis, costs plus a fixed fee basis, or cost plus a percentage basis. Such audits may be performed by Owner's employees or by professional auditing firms or both. If an audit reveals a discrepancy in Owner's favor, Contractor shall make an appropriate adjustment to the next applicable invoice issued to Owner, or if no further invoice is issued, Contractor shall issue a refund to Owner within thirty (30) days. If an audit reveals a discrepancy in Contractor's favor, Owner shall pay such amount to Contractor within thirty (30) days of invoice therefor (which invoice shall, if prior to Final Acceptance, be submitted in accordance with Section 5.2 as part of a progress payment invoice).

# ARTICLE 10
## INDEMNIFICATION BY CONTRACTOR

10.1. (a) To the maximum extent permitted by Applicable Laws, Contractor shall indemnify, defend, at its sole cost and expense, and hold harmless Owner and its affiliates and their respective agents, members, officers, directors, representatives, employees, successors and assigns (the **"Owner Indemnified Parties"**) from and against any and all claims, demands, suits or cause of action (whether at law or in equity and whether based on Applicable Law or on theories of contract, tort, strict liability or otherwise) (collectively, **"Claims"**) and all losses, costs, damages, injuries, liabilities, fines, penalties and interest (including the costs of settlement, mediation, litigation, arbitration, judgments and expenses, including documented attorneys' fees and expenses incurred in establishing any right to indemnity hereunder) resulting from or related to any Claims or otherwise incurred or suffered by any Owner Indemnified Party, of every nature and description (collectively, the **"Damages"**):

        (1)      arising from or in any manner relating to the failure of Contractor or any Contractor Personnel to comply with, or perform any or all of the Work in accordance with, any Applicable Laws (including those relating to wetlands, waterways and/or protected species) or the terms of this Agreement;

        (2)      by or on behalf of employees of Contractor and/or any or all Subcontractors (**"Contractor Party Employees"**) or persons or entities other than Contractor Party Employees, including Claims for injuries and death to Contractor Party Employees or other persons or damages to property (whether of Owner or any third

17



party), to the extent arising from or in any manner relating to the negligence or other legal fault of Contractor and/or any Contractor Personnel, and whether based on tort, contract or any other legal theory or in equity (provided that, without modifying the scope of the foregoing indemnification obligations, Contractor shall defend any such Claim by or on behalf of any Contractor Party Employee regardless of whether arising from or in any manner relating to the negligence or other legal fault of Contractor and/or any Contractor Personnel, one or more Owner Indemnitees or both the legal fault of Contractor and/or any Contractor Personnel and one or more Owner Indemnified Parties);

(3) with respect to non-payment of any amounts due to any or all of the Subcontractors pursuant to any or all of the Subcontracts that are payable in connection with the Work;

(4) with respect to Hazardous Materials generated by, or brought onto the applicable Site (or any adjoining tract of land accessed in connection with the Work) by, or whose presence, exacerbation, aggravation or discharge results from the negligence or willful misconduct of, Contractor or any Contractor Personnel or person or entity for whom Contractor or any Subcontractor is responsible or from the breach by Contractor of this Agreement; and/or

(5) Contractor shall fully indemnify Owner against any loss resulting from claims of unpaid Contractor Taxes and from any other taxes and/or duties for which Contractor is responsible hereunder.

(b) As to any claim made by Owner hereunder, Contractor expressly waives solely for purposes of its obligations under this Section 10.1 any limitation of liability or immunity from suit with respect to injuries to employees of Contractor which may be extended to Contractor under any applicable workers' compensation statute.

(c) Contractor's duty to defend arising out of this Section 10.1 shall be with counsel reasonably acceptable to Owner, and Contractor shall cause such counsel to consult with Owner on all major decisions relating to Claims. Contractor shall not, without the prior written consent of each applicable Owner Indemnified Party, settle or compromise, or permit a default judgment or a consent to entry of any judgment with respect to, any Claim for which Contractor has indemnification obligations under this Agreement, unless such settlement or compromise or judgment is solely for the payment of money and includes a full, unconditional release of each applicable Owner Indemnified Party with respect to all liability related to such Claim. Owner reserves the right to defend itself at its own expense and, in the event that Contractor fails to timely assume or diligently conduct the defense of any Claim under this Section 10.1 or Owner reasonably concludes that there may be legal defenses available to any Owner Indemnified Party which are different from or additional to, or inconsistent with, those available to Contractor or any Contractor Personnel, Owner shall have the right to select up to one separate counsel to participate in such action or proceeding on its own behalf at Contractor's expense.

18



(d)     Contractor's monetary obligations under this <u>Section .10.1</u> shall not be limited to the amount of insurance coverage carried or required to be carried by Contractor under the Agreement or limited in any way by any limitation on the amount or type of Damages, compensation or benefits payable by or to Contractor or any Subcontractor or Owner or any of its affiliates under any insurance policy or workers' or workmen's compensation acts, disability benefits acts or other employee benefit acts; *provided, however,* that no provision of this <u>Section 10.1</u> shall be deemed to constitute the waiver of any legal or factual defense or limitation as to any party other than Owner Indemnified Parties, and the Parties stipulate and agree that there are no intended third-party beneficiaries of the provisions hereof other than Owner Indemnified Parties.

(e)     To the extent that any of the obligations imposed by this <u>Section 10.1</u> shall not be enforceable under Applicable Laws it is the intent of the Parties that the provisions of this <u>Section 10.1</u> shall be construed to impose only such obligations on Contractor and Owner as shall be enforceable under Applicable Laws.

### 10.2.  Infringement/Indemnification.

10.2.1  Contractor warrants and represents to Owner that any Deliverable, Material, apparatus, process, technology, know-how and the like or any part thereof used in the Work does not and will not violate or infringe any copyright, trademark, service mark, patent or invention, trade secret or other intellectual property or proprietary right of any third party.

10.2.2  To the maximum extent permitted by applicable Laws, Contractor shall defend, at its sole cost and expense, indemnify and hold harmless, each of the Owner Indemnified Parties from (i) any third party Claim that any Material, Deliverable or the performance of the Work infringes, or is alleged to infringe any copyrights, trademarks, service marks, patents or inventions, trade secrets, or other intellectual property or proprietary rights of any third party or is the basis for a claim of unfair competition resulting from similarity in design, trademark, or appearance and (ii) any Damages of any nature or kind arising out of any infringement or alleged infringement or claim of unfair competition with respect to the Work. In addition, Contractor shall defend, at its sole cost and expense, indemnify, and hold harmless each of the Owner Indemnified Parties from and against, and shall pay, all awards of Damages assessed and all costs of Claims adjudged against the Owner Indemnified Parties in such suits or proceedings relating to the Work.  At Contractor's expense, the Owner Indemnified Parties may be represented by and actively participate through its own counsel in any such suits and proceedings if it so desires.  In case any part of the Work is held in any such suit or proceeding to constitute infringement and its use is enjoined, Contractor shall, or at any time after a claim of infringement arises, Contractor may (at Owner's option), promptly either (1) secure for Owner the perpetual right to continue the use of such part of the Work by procuring for Owner a perpetual, royalty-free license or such other permission as will enable Contractor to secure the suspension of any injunction; (2) replace at Contractor's own expense such part of the Work with an adequate non-infringing part or modify it so that it becomes non-infringing, but only if the replacement or modification does not adversely affect Owner's acquisition costs, operating or maintenance costs, construction or operating schedules, operation or maintenance procedures, public relations, employee relations, any license or permit

19



affecting Owner's property, the functionality or optionality of the Work, or any other matter relating to Owner's property or its operation; or (3) refund the entire Contract Price of the Work affected.

## ARTICLE 11
## INSURANCE

11.1. **Insurance Requirements.** Contractor shall obtain and maintain, and require its Subcontractors to obtain and maintain, during the term of this Agreement, insurance coverage with limits, terms and conditions as set forth in this <u>Article 11</u>.

| Type of Insurance | Limits of Liability |
|---|---|
| 11.1.1 Commercial General Liability | $1,000,000 combined single limit per occurrence with a deductible or SIR not to exceed $25,000. |

The Commercial General Liability policy shall be written on an occurrence basis and include and completed operations coverage. The Commercial General Liability policies of Contractor and its Subcontractors shall be endorsed as follows:

"Such insurance as afforded by this policy for the benefit of Owner (including its directors, officers, affiliates, agents and employees) who is added as an additional insured and shall be primary as respects any claims, losses, damages, expenses, or liabilities arising out of, relating to in any way, or incident to the Work for Owner or any activities of Contractor Personnel on the premises of, or in connection with any property of, Owner or its affiliates, regardless whether instituted against Owner alone or jointly with the Contractor Personnel or others,. Any insurance carried by Owner shall be excess of and non-contributing with insurance afforded by this policy."

If any of the Work performed by Contractor or its Subcontractors includes blasting, explosion, excavation, pile driving or caisson work, moving, shoring, underpinning, razing or demolition of any structure or removal or rebuilding of any structural support thereof, or any subsurface work, the Commercial General Liability policy shall cover such activities and the certificate of insurance described below shall indicate that insurance is provided for such activities.

| | | |
|---|---|---|
| 11.1.2 | Business Auto Liability | $1,000,000 combined single limit per accident, including coverage for all owned, non-owned, hired and leased automobiles. |
| 11.1.3 | Workers' Compensation | Coverage shall comply with any Applicable Law. |

20



| 11.1.4 | Employers Liability | $1,000,000 (each accident) |
|---|---|---|
| | | $1,000,000 (disease-policy limit) |
| | | $1,000,000 (disease-each employee) |
| 11.1.5 | Excess/Umbrella | Not less than $10,000,000 providing coverage in excess of limits required in 11.1.1, 11.1.2 and 11.1.3) |

11.2. **Certificates/ Additional Insured.** Prior to the commencement of Work under the Contract Documents, Contractor and its Subcontractors shall provide Owner with certificates of insurance as evidence of the above insurance requirements. Any failure of such certificates to conform to the contractual requirements specified herein shall not result in a waiver of Contractor's required insurance and all indemnity obligations in the Contract Documents and all such insurance obligations shall continue in full force and effect. Such certificates shall name Owner, its directors, officers, affiliates, agents and employees and such other parties as Owner may designate as an additional insured (except workers' compensation), provide that Owner shall receive sixty (60) days' prior written notice of non-renewal, cancellation of or modification to any of the above policies and indicate that the Commercial General Liability policy has been endorsed as described above.

11.3. **Ratings.** All insurance shall be placed and maintained with insurers authorized to do business in the Site State and other locations where the Work will be performed, with an A.M. Best rating of A- / VII or better.

11.4. **Reservation of Rights.** If Contractor fails to comply with its obligations as specified in this Article 11, Owner shall have the right, but not the obligation to procure at Contractor's expense the required insurance coverage.

11.5. **Subcontractors.** In the event that Contractor uses Subcontractors in connection with the performance of the Work, Contractor shall require all such Subcontractors provide the insurance coverage as specified in this Article.

11.6. **Accident Reports.** Contractor shall furnish Owner with copies of any accidents report(s) sent to Contractor's insurance carriers covering accidents occurring in connection with or as a result of the performance of the Work. Contractor shall furnish said copies to Owner's insurance and loss control unit concurrently with providing the reports to its insurers.

11.7. **Compliance.** These requirements are in addition to any other insurance requirements which may be required elsewhere in the Contract Documents. Contractor shall comply with any governmental and/or site specific insurance requirements even if not stated herein.

11.8. **Reduction of Coverage.** Contractor shall notify Owner in writing when aggregate limits required herein have been reduced as a result of claim payments, expenses or both. If any of the required insurance coverages contain aggregate limits applying to other operations of Contractor outside Work performed for Owner pursuant to any Purchase Order, and such limits are diminished by any incident, occurrence, claim, settlement, or judgment against such insurance,

21



Contractor shall take immediate steps to restore such aggregate limits or shall provide other insurance protection for such aggregate limits.

11.9. **Contractor Obligations Not Limited.** None of the requirements contained herein as to types, limits, or Owner's approval of insurance coverage to be maintained by Contractor are intended to and shall not in any manner limit, qualify, or quantify the liabilities and obligations assumed by Contractor under this Agreement, any other agreement with Owner, or otherwise provided by law or in equity.

11.10. **Additional Requirements.** All of the policies Contractor shall maintain under this Article (except workers' compensation) shall provide the following: (a) standard cross-liability provisions and (b) waiver of all rights of subrogation against Owner.

## ARTICLE 12
## TERMINATION

12.1. **General.** This Agreement shall enter into full force and effect as of the Effective Date and remain in full force and effect, subject to any earlier termination thereof in accordance herewith, until the first anniversary of the Effective Date.

12.2. **Termination By Owner for Contractor's Default.** Owner may terminate all or any of the Contract Documents or suspend the Work, in whole or in part, or both, at any time, effective upon seven (7) Days' notice from Owner to Contractor of Contractor's default if, in the case that such default is curable, Contractor does not cure such default within such period. Contractor's default shall include: (1) abandonment or cessation (other than as permitted hereby) of the Work by Contractor; (2) Contractor's repudiation of any of its obligations under the Contract Documents; (3) the reasonable belief by Owner that Contractor will not be able to perform the Work in a satisfactory or timely manner; (4) Contractor's breach of any material obligation in the Contract Documents which is not cured within five (5) days of receipt of written notice of breach; (5) Contractor's commission of breaches of its obligations which collectively constitute a material breach; (6) Contractor files for protection under the United States Bankruptcy Code or is subject to an involuntary petition not otherwise dismissed within sixty (60) days; (7) Contractor makes a general assignment for the benefit of creditors or assigns this Agreement or any Purchase Order without the written consent of Owner; (8) Contractor's breaches any of its obligations under Article 15; (9) Contractor dissolves, liquidates, winds-up or ceases to do business in the ordinary course; (10) any representation or warranty by Contractor is false or misleading in any material respect when made and Contractor fails to remedy such representation or warranty within five (5) days after written notice from Owner; (11) the aggregate amount of liquidated damages paid or payable (or that would be payable but for any cap) equals or exceeds the lesser of the Contract Price and the applicable cap; (12) Contractor fails to maintain any insurance coverages required of it hereunder, (13) Contractor fails to supply sufficient skilled workers or suitable materials or equipment to perform the Work or (14) the occurrence of any other default specified in the applicable Purchase Order. In the event of suspension, Contractor shall resume the Work within seventy-two (72) hours of notice to resume from Owner.

12.2.1 Effective upon termination or suspension or any effective date of termination or suspension set forth in such notice, Contractor shall discontinue the all or

22



the notified portion of the Work in accordance with such notice, shall place no further orders with respect to such Work, shall assemble and deliver to Owner any tangible Work in a deliverable status to the extent possible, shall hold for Owner's direction or disposition as specified in the notice an raw materials or Work in process not in a deliverable state and shall preserve and protect Materials on hand purchased or committed for such Work, pending Owner's instructions. Upon termination under this Section, Owner may in its sole discretion take over the terminated Work and prosecute the same to completion. Owner may, at its option, elect to have itself (or its designee, which may include any affiliate of Owner or any third party purchaser) (i) assume responsibility for and take title to and possession of any or all Work or Materials remaining at the Site and (ii) succeed automatically (upon delivery of written notification by Owner (or its designee) to all third parties concerned), without the necessity of any further action by Contractor (provided that Contractor shall at its expense cooperate and take any action requested by Owner in connection with any such succession or any Owner-requested assignment of Subcontracts), to the interests of Contractor in any or all items procured by Contractor for the Work and in any and all Subcontracts entered into between Contractor and any Subcontractor with respect to the Work, in each case as selected by Owner (or its designee). With respect to all such Subcontracts that Owner (or its designee) so succeeds to, it shall be required, as between Contractor and Owner (or its designee), to compensate such Subcontractors only for compensation becoming due and payable to such Subcontractors under the terms of their respective contracts and subcontracts with Contractor for Work performed from and after the date Owner (or its designee) elects to succeed to the interests of Contractor in such contracts and subcontracts. All sums claimed by such Subcontractors to be due and owing for Work performed prior to such date shall constitute debts between Contractor and the affected Subcontractors, and Owner (or its designee) shall in no way be liable for such sums. Contractor shall include in all contracts and subcontracts entered into with Subcontractors a provision providing for the foregoing.

(a)     If such termination was by Owner pursuant to <u>Section 12.2</u> hereof, then, in addition to any liquidated damages due under <u>Article 8</u> hereof, Owner shall be entitled (i) to recover from Contractor, and Contractor shall pay to Owner upon demand, any costs reasonably incurred by Owner in completing the Work (or causing the completion of the Work) in the event and only to the extent such costs exceed the remaining unpaid portion of the Contract Price that would have been payable to Contractor hereunder to complete the Work if the Purchase Order had been fully performed and (ii) to exercise any rights or remedies available to Owner hereunder or at law or in equity, subject to any applicable limitations on Owner's remedies and/or Contractor's obligations and liabilities that are expressly set forth in this Agreement.

12.2.2  In the event of termination under this Section, Contractor's compensation shall be limited to the portion of the Contract Price with respect to the Work deemed by Owner to be satisfactorily performed by Contractor up to the effective date of termination less Owner expense incurred pursuant to <u>Section 12.2.1</u> and any amounts owing to Owner under the Contract Documents, and shall be subject to <u>Section 17.13</u>. Owner may require Contractor to substantiate its partial performance to Owner's satisfaction, and at Owner's request, Contractor shall prepare an accurate and complete written summary of the Work. Contractor's compensation shall be subject to set-off for any back-charges, claims and

23



costs (including costs pursuant to Section 12.2.1) incurred by Owner as a result of Contractor's default. If, after exercising the right of set off, Contractor's compensation is less than the cost of completing the Work or correcting defective Work, Contractor shall receive no compensation and shall pay the difference to Owner upon demand. No payment shall be made to Contractor until determination by Owner of all costs associated with termination of the Work, which determination shall be made by Owner promptly, but in any event, within a reasonable period of time from the date of delivery of the notice of termination and receipt of all related supporting documentation.

12.2.3 If, after notice of termination or suspension pursuant to this Section 12.2, it is determined that Contractor was not in default in the performance of any obligation under the Contract Documents, the rights and obligations of the Parties shall be the same as if the notice had been originally issued pursuant to Section 12.3.

12.3. **Owner's Termination for Convenience.** Owner may, in its sole discretion, terminate any of the Contract Documents or suspend the Work, in whole or in part, or both at any time, for any reason whatever or for its convenience, effective upon written notice to Contractor or any date specified therefor in such notice. Upon receipt of notice of termination or suspension, Contractor shall discontinue the affected portion of the Work, shall place no further orders with respect to the affected portion of the Work and shall preserve and protect Materials on hand purchased or committed for the Work, pending Owner's instructions. If Owner so requests, Contractor shall execute and deliver all documents and take all other steps, including legal assignments, as necessary to transfer to Owner (or to Owner's designee, which may be any affiliate of Owner or any third party purchaser) all of Contractor's right, title and interest in and to all Equipment procured by Contractor and all contractual rights of Contractor under all Subcontracts, warranties, guarantees and other agreements related thereto effective no later than the date of the payment of Owner to Contractor of the termination compensation to which Contractor is expressly entitled to hereunder. In the event of suspension, Contractor shall resume the Work within seventy-two (72) hours of notice to resume from Owner (or by such later date that Owner so notifies). If any of the Contract Documents are terminated, Contractor shall be entitled to compensation in accordance with the terms of the applicable Purchase Order and other applicable Contract Documents for the portion of the Work deemed by Owner to be satisfactorily performed by Contractor, and all reasonable, actual termination costs incurred by Contractor, less any salvage value of any completed Work, as a result of terminating and demobilizing all aspects of the Work theretofore properly performed by Contractor and its Subcontractors hereunder, but excluding any and all costs and expenses incurred by Contractor from and after the date of termination for those of its employees who are not directly performing required termination and demobilization services (whether or not Contractor has reassigned such employees to other work following Owner's notice of termination), as audited and accepted by an independent certified public accounting firm selected and paid for by Owner and reasonably acceptable to Contractor, and only in the event and to the extent such costs are not covered by payments previously made hereunder or under clauses (i) and (ii) directly above. Owner may require Contractor to substantiate its partial performance to Owner's satisfaction. Unless otherwise agreed in the Purchase Order, the costs and expenses to be paid to Contractor under this Section shall be Contractor's sole and exclusive compensation if the Contract Documents are terminated for convenience and in all cases shall be subject to Section 17.13.

24



**12.4. Termination or Suspension by Contractor for Owner's Default.** Contractor may terminate the Contract Documents or suspend the Work effective upon seven (7) Days' notice from Contractor to Owner upon the occurrence of any one or more of the following events, acts or conditions:

      (a)    Any representation or warranty made by Owner under <u>Section 14.1</u> hereof is false or misleading in any material respect when made, and Owner fails to remedy such representation or warranty within thirty (30) days after Owner receives a written notice from Contractor; and

      (b)    Owner fails to pay to Contractor any required payment which is not in dispute, and such failure continues for thirty (30) days after receipt of written notice of such failure.

**ARTICLE 13**
**NON-DISCLOSURE**

**13.1. Non-Disclosure of Information.** Any Data provided to, or gathered, developed, compiled or similarly obtained in any manner whatsoever at any time by, Contractor is confidential and proprietary to Owner as well as the contents of any Deliverables and the contents of the Contract Documents (**"Confidential Information"**) and such Confidential Information shall not be disclosed, duplicated, or distributed by Contractor, its agents or employees to any person or entity other than those designated in a writing signed by Owner, or used by Contractor in any manner in regard to any other customers, employers, or Contractors with whom Contractor may work or be affiliated with. Contractor agrees that only its "authorized representatives" shall have access to the Confidential Information. An "authorized representative" of Contractor is an individual who has a need to receive the Confidential Information in order for Contractor to perform the requested Work, and who has agreed in writing to be bound by the terms of these <u>Article 13</u> confidentiality provisions. Contractor agrees to be responsible for any breach of the Contract Documents by its authorized representatives or Subcontractors. Owner does not make any representation or warranty, express or implied, as to the accuracy or completeness of the Owner Data. Contractor shall keep strictly confidential and not use Owner Data for any purpose other than for meeting its obligations under the Contract Documents. Contractor acknowledges that the use or disclosure of the Confidential Information may cause substantial, irreparable injury to Owner and Owner may, in addition to other legal remedies it may have, obtain injunctive relief to prevent such use or disclosure. The restrictions in this paragraph shall not apply to information that (1) was independently known to Contractor prior to obtaining the same from Owner, (2) is, at the time of disclosure by Contractor, then in the public domain, or (3) is obtained by Contractor from a third party who did not receive the same under an obligation of confidentiality. Information shall not be deemed to fall within the exceptions of <u>subparts (1)</u> to <u>(3)</u> above merely because it is included in a document which also includes information that does fall within such exceptions. This obligation of confidentiality shall survive the termination of this Agreement or any Purchase Order, regardless of the reasons of any such termination.

**13.2. Precautions by Contractor.** Contractor shall take all reasonable precautions to prevent all employees and agents of Contractor from disclosing or using any Confidential Information other than as permitted by <u>Section 13.1</u>.

25



## ARTICLE 14
## REPRESENTATIONS AND WARRANTIES

14.1. **Representations and Warranties of Owner.** Owner makes the following representations and warranties to Contractor, each of which is true and correct on the date hereof:

14.1.1 **Due Organization, Power, Authority and Solvency.** Owner is a limited liability company organized, existing and in good standing under the laws of the State of Delaware; Owner possesses all requisite power and authority to enter into and perform this Agreement, and to carry out the transactions contemplated herein; Owner has or will have the financial resources to make all payments contemplated in this Agreement; and Owner has all legal power and authority to transact the business in which it is engaged;

14.1.2 **Binding Obligations.** Owner's execution, delivery, and performance of this Agreement have been duly authorized by all necessary proceedings on its part and will not conflict with, result in the breach of, constitute a default under or accelerate performance required by any of the terms of its organizational documents; this Agreement has been duly executed and delivered by it; and this Agreement constitutes Owner's legal, valid, and binding obligation enforceable in accordance with its terms, except to the extent that its enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general principles of equity;

14.1.3 **No Existing Breach or Default.** Owner is not currently in breach of, in default under, or in violation of, and the execution and delivery of this Agreement and the performance of its obligations hereunder will not constitute or result in any breach of, default under or violation of, any Applicable Laws, or the provisions of Owner's organizational documents, or any franchise or license, or any provision of any indenture or any evidence of indebtedness or security therefor, lease, contract, license or other agreement by which it is bound, except for such breaches, defaults or violations as will not, either individually or in the aggregate, result in a material adverse effect on the ability of Owner to perform its obligations hereunder.

14.1.4 **No Pending Litigation, etc.** No suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or, to the best knowledge of Owner, threatened against Owner that would affect the validity or enforceability of this Agreement or the ability of Owner to fulfill its commitments hereunder in any material respect.

14.2. **Representations and Warranties of Contractor.** Contractor makes the following representations and warranties to Owner, each of which is true and correct on the date hereof and at all times until Final Acceptance:

14.2.1 **Due Organization, Power and Authority.** Contractor is a corporation duly organized, existing and in good standing under Applicable Law; possesses all requisite power and authority to enter into and perform this Agreement and to carry out the transactions contemplated herein; and has all legal power and authority to own and use its

26



properties and to transact the business in which it is engaged and holds or expects to obtain in a timely manner all material franchises, licenses, and permits required therefore;

14.2.2 **Binding Obligation.** Contractor's execution, delivery, and performance of this Agreement have been duly authorized by all necessary proceedings on its part, and are in accordance with, its articles of incorporation and by-laws and will not conflict with, result in the breach of, constitute a default under or accelerate performance required by any of the terms of its organizational documents; this Agreement has been duly executed and delivered for it by the signatories so authorized; and this Agreement constitutes Contractor's legal, valid, and binding obligation enforceable in accordance with its terms, except to the extent that its enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the rights of creditors generally or by general principles of equity;

14.2.3 **No Existing Breach or Default.** Contractor is not currently in breach of, in default under, or in violation of, and the execution and delivery of this Agreement and the performance of its obligations hereunder will not constitute or result in any breach of, default under or violation of, any Applicable Laws, or the provisions of Contractor's articles of incorporation or by-laws, or any franchise or license, or any provision of any indenture or any evidence of indebtedness or security therefor, lease, contract, license or other agreement by which it is bound, except for such breaches, defaults or violations as will not, either individually or in the aggregate, result in a material adverse effect on the ability of Contractor to perform its obligations hereunder;

14.2.4 **No Pending Litigation, etc.** No suit, claim, action, arbitration, or legal, administrative or other proceeding is pending or, to the best knowledge of Contractor, threatened against Contractor that could affect the validity or enforceability of this Agreement, the ability of Contractor to fulfill its commitments hereunder in any material respect, or that would result in any material adverse change in the business or financial condition of Contractor.

14.2.5 **Contractor Qualified to Perform the Work.** Contractor has the required skills and capacity to perform the Work in a professional manner using state-of-the-art techniques and sound engineering, procurement, construction, project management and supervisory practices, all in accordance with the requirements of the Contract Documents and with first class workmanship.

## ARTICLE 15
## FITNESS FOR DUTY

15.1. **General Requirement.** Contractor shall hold the Contractor Personnel (when working at Owner's facilities) to a standard at least as stringent as Owner's employees are held to pursuant to Owner's fitness for duty policies, including but not limited to policies regarding drugs and alcoholic beverages. The full policies are available upon request. The following summarizes Owner's policy:

27



*"The use of alcohol at work or within five hours before reporting to work, the use of any illegal drug or abuse of any legal drug are strictly prohibited. Employees are also prohibited from possessing alcohol, non-medically authorized controlled substances, illegal drugs and/or drug-related paraphernalia while on company property, in company vehicles, or while on duty at any time at any location"*

**15.2. Removal of Offending Employees.** Contractor shall immediately remove, and deny access to Owner's Site to, any Contractor Personnel who violates or can be reasonably suspected by Contractor of violating the policies adopted by Contractor to conform with this Article.

**15.3. Removal of Employees Generally.** In addition to <u>Section 15.2</u> above, Contractor shall remove any individual assigned by Contractor to perform the Work hereunder upon Owner's written request within one (1) day of receipt of such notice. Upon receipt of such notice, Contractor will provide Owner with suggested replacements and resumes or other qualification material regarding such replacements for Owner's consideration. Owner shall have the right to approve any such replacement in its sole discretion.

**15.4. Drug Screening.** Contractor is required to have in place a drug screening program for all of its employees assigned to work on Owner property and/or systems. The program shall provide screening in these three areas:

        A.    Pre-assignment drug testing;
        B.    Drug testing for cause; and
        C.    Random drug screening.

### ARTICLE 16
### COMPLETION OF THE WORK

**16.1. Notice of Completion – Verification.** Contractor shall notify Owner when it has completed the Work. Owner will inspect and accept or reject the Work as promptly as practicable after delivery, except as otherwise provided in the Contract Documents. Owner shall inspect the Work and notify Contractor in writing either (1) that the Work is satisfactory and Contractor has achieved Final Acceptance, or (2) that all or part of the Work does not conform to the Contract Documents. Contractor shall correct such non-conforming Work at Contractor's expense. Owner's failure to inspect the Work and Owner's acceptance or rejection of the Work shall (1) not relieve Contractor from its warranty obligations or from responsibility for Work which does not comply with the Contract Documents or (2) impose liability upon Owner therefor.

**16.2. No Waiver.** Neither Owner's payment of Contractor's final invoice issued in respect of the Work nor its verification that the Work has been completed nor achievement of Final Acceptance shall be construed as a waiver of any of Contractor's warranty obligations or as acceptance of any deficient Work not discovered prior to such payment or Final Acceptance or during such verification.

28



## ARTICLE 17
## MISCELLANEOUS

**17.1. Entire Agreement.** This Agreement and the other Contract Documents set forth the full and complete understanding of the Parties regarding the Work and supersedes all previous understandings, written or oral, which may have existed relating to the Work, including, without limitation, that certain partially executed Letter of Intent and Limited Direction to Proceed dated March 20, 2015 ("LOI") between the Parties; *provided* that the Parties acknowledge and agree that the scope of work authorized pursuant to the LOI (which constitutes part of the Work hereunder) continues to be authorized hereunder without the need for any Notice to Proceed or Limited Notice to Proceed hereunder and such Work shall be paid as part of the Contract Price hereunder in accordance with the invoicing and payment terms set forth herein.

**17.2. Amendments.** The Contract Documents may not be modified, amended, or otherwise changed except by instrument in writing signed by an authorized representative of Owner and Contractor pursuant to <u>Article 7</u> of this Agreement or by a written amendment signed by an authorized representative of Owner and Contractor expressly amending this Agreement.

**17.3. Assignment.** The Contract Documents shall inure to the benefit of and be binding upon the successors and assigns (to the extent assignment is permitted by the next sentence) of the Parties. The Contract Documents or any rights or obligations hereunder may not be assigned by either Party without the written consent of the other; *provided, however,* Owner may, with notice to Contractor but without Contractor's approval, (i) assign any or all of its rights under this Agreement as collateral security to any person providing financing to Owner with respect to Owner's facility and (ii) assign with novation any or all of its rights and/or obligations under this Agreement to any affiliate of Owner or any transferee of the facility or a substantial portion thereof. For purposes of this paragraph "affiliate" means (a) a surviving or successor company to Owner in the event of a merger, sale of substantially all of its assets or equity securities, or consolidation, or (b) a company that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, Owner, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such party, whether through the ownership of voting securities, by contract, or otherwise.

**17.4. Governing Law and Consent to Jurisdiction.** The Contract Documents shall be deemed to be executed in the State of North Carolina and shall be governed and construed in accordance with the laws of State of North Carolina without regard to conflict of laws analysis. Any legal action or proceeding against a party under the Contract Documents to enforce an arbitral award obtained in accordance with the terms of <u>Article 18</u> hereof may be brought in the courts of the State of North Carolina or in the United Stated District Court for the district in which the Site is located. Each of the Parties hereby irrevocably consents to the such jurisdiction and irrevocably waives any objections, including, without limitation, any objection to the laying of venue or based on the grounds of *forum non conveniens*, which it may now or hereafter have to the bringing of any such action or proceeding in such respective jurisdictions. The foregoing is without prejudice to the right of any prevailing Party to seek enforcement of any judgment rendered in a court in any jurisdiction where the losing Party or its property may be located. Each Party hereby irrevocably consents to the service of any and all process in any action or proceeding by delivery of copies of

29



such process by commercial courier to it at its address specified herein or in any other manner permitted by Applicable Law.

17.5. **Severability.** In case any one or more of the provisions or application of the provisions contained in the Contract Documents shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained in the Contract Documents and their application shall not in any way be affected or impaired.

17.6. **Titles and Headings.** Titles and headings to Articles and Sections in the Contract Documents are inserted for convenience of reference only and are not intended to affect the interpretation or construction of the Contract Documents.

17.7. **Survival of Terms.** The provisions of Sections 2.2, 2.4, 5, 6, 8, 9, 10, 11, 12, 13, 14 and 17 shall survive the performance and termination of the Contract Documents and all other indemnity, warranty, confidentiality and insurance obligations under the Contract Documents, and all obligations to comply with applicable laws, safety requirements and all other requirements and prohibitions set forth in the Contract Documents in performing those obligations that survive expiration or termination of the Contract Documents, shall survive termination or expiration of the Contract Documents.

17.8. **Notices.** Any notice pertaining to the Work or the Purchase Order required to be given to either Party shall be deemed duly given when written and delivered personally or when sent by first class mail, postage prepaid, facsimile transmittal, or via commercial overnight courier, to the intended Party at the address provided in the Purchase Order or at such changed address as may from time to time be designated in a notice similarly delivered or mailed; *provided* that, in the event that there is no outstanding Purchase Order, notices shall be sent to the following address:

    Owner:        Enviva Pellets Sampson, LLC
                    7200 Wisconsin Avenue, Suite 1000
                    Bethesda, Maryland 20814
                    Attn: General Counsel
                    Facsimile: (240) 482-3774

                    or, in the case of invoices deliverable to Owner, to:
                    accounting@envivabiomass.com

    Contractor:  C. Terry Hunt Industries, Inc.
                    5420 Inner Perimeter Drive
                    Valdosta, GA 31601
                    Facsimile: 229-244-9376
                    Attention: Joel Hunt, VP

17.9. **Preference in Interpretation.** Contractor acknowledges that it understands each and every provision in the Contract Documents, and shall not assert as a basis for the construction of language that the language was drafted by Owner or its counsel.

30

17.10. **Publicity.** With the sole exception of publication of such information within Contractor's corporate entity and subject to the confidentiality provisions of this Agreement, Contractor shall not refer to Owner or any company affiliated with Owner, or any aspect of the Work, in any advertising, website or other publication, including technical papers, proposals, sales collateral or articles in connection with Work performed by Contractor, without the prior written approval of Owner. Contractor shall refer to Owner any inquiry from the news media concerning the Work prior to its response and shall reflect Owner's comments in any such response.

17.11. **Waiver.** Except as may be specifically agreed in writing, the failure of Owner to insist in any one or more instances upon the strict performance of any one or more of the provisions of this Agreement or to exercise any right herein contained or provided by law or equity, will not be construed as, or constitute in any way, a waiver, modification or relinquishment of the performance of such provision or right(s), or of the right to subsequently demand such strict performance or exercise such right(s), and all such rights will continue unchanged and remain in full force and effect. No payment to Contractor by Owner will constitute an acceptance of any Work furnished by Contractor or shall relieve Contractor of any of its obligations or liabilities with respect thereto.

17.12. **Force Majeure.** Owner and Contractor shall be excused for delays in delivery or in performance where such delay is directly due to a Force Majeure Event. As used in this Agreement, a "Force Majeure Event" shall mean any act or event that (a) arises after the date of this Agreement, (b) is not reasonably foreseeable, (c) is not due to the fault or negligence of the Party affected, (c) could not be prevented or overcome by the reasonable efforts and due diligence of the Party claiming the Force Majeure Event, and (d) has an impact that will demonstrably, materially and adversely affect the affected Party's ability to perform its obligations in accordance with the terms of this Agreement, including, but not restricted to, the occurrence of the following: flood, drought, earthquake, natural disasters, hurricanes, tornadoes, mudslides, fire, explosion, epidemic, war, riot, embargoes, vandalism or other public disorder or civil disturbance or disobedience, blockages, insurrections, hostilities, sabotage, expropriation or confiscation, epidemic or quarantine, labor dispute of a regional or national nature, sabotage or terrorism, restraint by court order or public authority. By no later than five (5) days after the occurrence of a Force Majeure Event, the affected Party shall provide a written notice to the other Party specifying the nature and probable extent of such delay. The Parties shall then immediately endeavor in good faith to determine what fair and reasonable extension of schedule(s) may be necessary, if any. The affected Party shall use its best efforts to mitigate the effects of the delay. Notwithstanding any other provision, if a Force Majeure Event lasts for more than one hundred eighty (180) consecutive Days or for more than one hundred eighty (180) days in the aggregate during any twelve (12) month period, either Party may terminate this Agreement upon written notice to the other Party. Termination of this Agreement by a Party pursuant to this <u>Section 17.12</u> shall be without liability to such Party; *provided* that such termination shall not affect any rights or obligations that may have accrued prior to such termination or that expressly or by implication are intended to survive termination, whether resulting from the event giving rise to terminate or otherwise.

17.13. **Consequential Damages.** The Parties hereby waive and shall not be liable for any special, incidental, exemplary, punitive or consequential damages, including, but not limited to,

31



loss of use, loss of profits or revenues arising between Owner and Contractor. The foregoing limitation on liability shall not be applicable to and shall in no way limit the liability of Contractor: (x) to indemnify Owner or any Owner Indemnified Parties in respect of third-party claims, or (y) to pay liquidated damages payable under the Contract Documents. Sections 5.5 and 6.2 are subject to the waiver in Section 17.13 with respect to loss of use, loss of profits or revenues, but such waiver shall not impair the Owner's right to damages under Sections 5.5 and 6.2.

17.14. **Counterparts.** This Agreement and any other Contract Documents may be executed in one or more counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same instrument. Execution and delivery of this Agreement by exchange of facsimile or other electronically transmitted counterparts bearing the signature of a Party shall be equally as effective as delivery of a manually executed counterpart by Party.

## ARTICLE 18
## RESOLUTION OF DISPUTES

18.1. **Work Continuance and Payment.** Unless otherwise agreed in writing, Contractor shall continue the Work and shall maintain the schedule of the Work and milestones during any dispute, mediation, arbitration or other proceedings or dispute resolutions procedures hereunder. Contractor shall continue to perform the Work and Owner shall continue to make undisputed payments in accordance with this Agreement during any dispute, mediation, arbitration or other proceedings or dispute resolutions procedures hereunder.

18.2. **Direct Discussions.** If the Parties cannot reach resolution on a matter relating to or arising out of the Agreement, the Parties shall endeavor to reach resolution through good faith direct discussions between the Parties' representatives, who shall record the date of first discussions and prepare and exchange memoranda stating the issues in dispute and their positions. If the Parties' representatives are not able to resolve such matter within forty-five (45) days of the date of first discussion, the Parties' representatives shall immediately inform senior executives of the Parties in writing that resolution was not affected. Upon receipt of such notice, senior executives of the Parties shall meet within fourteen (14) days to endeavor to reach resolution. If the dispute remains unresolved after sixty (60) Days from the date of first discussion, the Parties shall attempt in good faith to resolve the dispute in accordance with the mediation provisions set forth in Section 18.3 below.

18.3. **Mediation.** If direct discussions pursuant to Section 18.2 do not result in resolution of the matter within the period set forth therein, the Parties shall endeavor to resolve the matter by mediation in accordance with the Center for Public Resources Model Procedure for Mediation of Business Disputes or such other mediation rules as the Parties may mutually agree. The administration and venue of the mediation shall be as mutually agreed by the Parties. The mediation shall be convened within thirty (30) days of the matter first being discussed and shall conclude within sixty (60) days of the commencement of such mediation. Either Party may terminate the mediation at any time after the first session, but the decision to terminate shall be delivered in person by the terminating Party to the non-terminating Party and to the mediator. The costs of the mediation shall be shared equally by the Parties.

32



18.4.  **Binding Dispute Resolution.**  Any matter that has not been resolved pursuant to the mediation procedure set forth in Section 18.3 within sixty (60) days of the commencement of such procedure shall be exclusively and finally settled by self-administered arbitration conducted in accordance with the then current rules of the Construction Industry Arbitration Rules and Mediation Procedures (the "Rules") of the American Arbitration Association ("AAA"), except as modified herein.  There shall be three (3) neutral arbitrators of whom each Party shall select one. The initiating Party shall select its arbitrator in its demand for arbitration and the recipient shall select its arbitrator within fourteen (14) days after receipt of the demand for arbitration.  The two arbitrators so appointed shall select a third arbitrator to serve as chairperson within twenty (20) days of the designation of the second of the two arbitrators.  If any arbitrator is not so timely appointed, at the request of any Party such arbitrator shall be appointed by the AAA case management office for Washington, DC in accordance with the Rules.  Each person serving as an arbitrator shall be an impartial and independent third party.  All arbitrators, upon appointment, shall agree to abide by the AAA Codes of Ethics for Arbitrators in Commercial Disputes.  The administration of the arbitration shall be as mutually agreed by the Parties.  Any arbitration shall be conducted in Washington, D.C. or at such other venue as may be agreed upon by the parties with such arbitration commencing within thirty (30) days following the selection of the chairperson. Each Party shall submit to the arbitrators and exchange with the other, in accordance with a procedure to be established by the arbitrators, its best offer.  The arbitrators shall be limited to awarding only one or the other of the two positions submitted. The award of the arbitrators shall be formalized in a written, reasoned award signed by the arbitrators and shall be final and binding on the Parties and non-appealable with respect to the matter or matters submitted to arbitration, and may be confirmed and enforced in any court of competent jurisdiction, unless such award is procured by corruption or fraud.  Except as provided in this Section 18.4, each Party hereby excludes and waivers irrevocably any rights or application or appeal to the courts of any jurisdiction to the fullest extent permitted by Applicable law.  An award may only be vacated, modified or corrected as permitted under Sections 10 and 11 of the Federal Arbitration Act of 1925.  If an award is vacated, the matter shall be resubmitted for resolution according to the terms of this Agreement.

18.5.  **Lien Rights.**  Without prejudice to the terms of any arbitral award or binding settlement between the Parties that may be issued or entered into pursuant to this Article 18 to the contrary, nothing in this Article 18 shall limit any rights or remedies not expressly waived by the Contractor that the Contractor may have under Applicable Law in respect of Contractor's lien rights.

18.6.  **Costs for Dispute Resolution.**  Each Party will bear its own costs for dispute resolution, except that the substantially prevailing Party shall be entitled to recover such costs, including reasonable attorney's fees and mediation or arbitration fees, as applicable, from the non-prevailing Party.

*[Remainder of Page Intentionally Left Blank]*

33



IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized officers as of the date first above written.

ENVIVA PELLETS SAMPSON, LLC

By Enviva Wilmington Holdings, LLC,
as its sole member

By Enviva Development Holdings, LLC,
as its managing member

By: _____

Title: _____VP Construction_____

Date: _____7/22/15_____

C. TERRY HUNT INDUSTRIES, INC.

By: _____ JOEL HUNT_____

Title: __VICE PRESIDENT_____

Date: __7/22/2015_____

34

Exhibit 8
Owner Minimum Project Site Safety Requirements

## MINIMUM PROJECT SITE SAFETY REQUIREMENTS

Enviva is committed to providing a healthy and safe work environment for their employees, contractors, and all others at our project sites to meet our companywide goal of achieving no harm to people. Our goal is to complete the work with ZERO lost-time incidents and ZERO recordable injuries.

The project is in an OSHA-regulated area. In conjunction with Enviva Safety Programs and the contractor's own safety policies, the requirements mandated and enforced by OSHA will be met. Coordination and communication are imperative in maintaining a safe work environment. Part of this safety plan will be to insure that the Safety Specialist is involved in the day-to-day planning and coordination of the project so that safety remains a key component to the means, methods and planning of the work.

Enviva will assign a Safety Specialist to the Project. The individual will have an extensive safety background and experience working in OSHA environments and shall lead the construction safety program for the project.

Each contractor will receive an Enviva Contractor Safety Handbook and as a minimum must adhere to the requirements delineated.

Each contractor will submit their safety program for Enviva review. Each contractor will administer their own safety program in conjunction with the requirements indicated in the Enviva Contractor Safety Handbook and the Enviva Contractor Safety Manual. Contractors shall be responsible for the Health, Safety, Security and Environmental (HSSE) awareness and policy compliance of its agents, personnel, Subcontractor and Sub-subcontractor personnel engaged in work.

It is Enviva's expectation that all project work be performed in such a manner that health, environment, and property are protected and this expectation is reflected in Enviva's rules, regulations, policies and guidelines. Contractors shall be responsible for ensuring that its agents, personnel and Subcontractor and Sub-subcontractor personnel are acquainted with all Enviva's general and site-specific HSSE requirements and shall plan and perform their work accordingly. Contractor's responsibility to protect the safety and health of personnel and the environment should be shared by all levels of its management and personnel; therefore, it is important that Contractor and its Subcontractors and Sub-subcontractors perform the work in accordance with all current Enviva rules, regulations, policies and guidelines as well as applicable law. If applicable law does not adequately protect against hazards arising from the work, Contractor shall adopt appropriate practices to address the hazard. All Contractor and Subcontractor and Sub-subcontractor personnel performing the work are required to follow this policy statement and adhere to these guidelines.

The Contractor Project Manager shall demonstrate a commitment to Zero Incidents, Injuries, and Illnesses by actively participating in the HSSE process. Contractor's Site-specific HSSE Plan shall

35



include a description of how Contractor's management will communicate their HSSE commitment, and their expected level of involvement in the HSSE process. At a minimum this shall include but not be limited to participation in:

- Contractor, Subcontractor and Sub-subcontractor HSSE orientation

- HSSE reinforcement/recognition of craft personnel

- Daily pre-task Safe Work Permits

The Contractor Project Manager shall periodically review work safety performance reports, including those of Subcontractors and Sub-subcontractors. Contractor's Project Manager shall periodically review, track and trend all near misses, incidents and injuries and communicate findings and corrective action plans to Enviva.

The Contractor Project Manager shall also participate in contractor, subcontractor and sub-subcontractor company-related recordable injury, significant incident and near-miss investigations.

Contractor and subcontractors and sub-subcontractors shall each provide at least one full-time HSSE Manager on Site and shall provide additional HSSE representatives on the basis of one HSSE representative per 20-50 personnel; provided however, Contractor, Subcontractors and Sub-subcontractors on Site with less than 20 personnel may designate an individual to be responsible for HSSE as part of a dual role. Staffing selection for either position will require evaluation and approval by Enviva.

**Precautions shall be taken at all times for the protection of persons and property. Each Contractor is responsible for the safety and health of its employees. Full compliance with OSHA, MSHA, ASME, and ANSI Standards, other provisions incorporated by reference, and Federal, State, and Local regulations is mandatory. In addition, ENVIVA requires that Contractor and its employees comply with the following requirements, at a minimum, on all ENVIVA projects. This section is not intended as a complete safety program in itself. Safety noncompliance is subject to Enviva Contractor Safety Notice Program as outlined in the *Enviva Contractor Safety Handbook* and the *Enviva Contractor Safety Manual*. Failure to comply could also result in disqualification and removal of Contractor.**

1) **Safety and Health Orientation**
Each Contractor employee must attend the ENVIVA Safety Orientation. Normally, such orientations will typically be two hours in duration, but this is an estimate for planning purposes only.

2) **Written Safety and Health Program**
Contractor must have a written safety and health program, and written Hazard Communication Program.

3) **Personal Protective Equipment and Clothing**
(Contractor will avoid costly delays by ensuring that all its employees have, or are provided, required PPE and clothing).

a) Eye protection (Safety glasses) that meets ANSI Z-87.1 requirements must be worn at all times when on ENVIVA projects except in administrative areas. Safety glasses

36



must have rigid side shields. Goggles and a face shield must be worn when cutting or grinding, or in designated areas.

b) Hard soled, leather, safety-toed shoes or boots (ANSI Z-41 approved) are required to be worn while working on all ENVIVA projects. Such footwear is not required in administrative areas. Tennis shoe or athletic shoe-style safety shoes are not permitted.

c) Hard hats (not bump caps) are required, and must conform to ANSI Z-89.1, Class B. Hard hats are required to be worn with the bill forward (except for welders wearing hoods and surveyors) on all ENVIVA projects. The hard hat must not be painted and must have Contractor's identification logo or name and employee's name on the front of the hat.

d) Hearing protection must be worn whenever noise is measured above 90dB, or normal conversation cannot be conducted, or when the area is posted as noise-hazardous.

e) Shirts must have at least a four-inch sleeve and shirttails must be tucked into the trousers unless welding. Trousers must never be tucked into boots. Tank tops and shorts are prohibited. Perforated or mesh shirts and pants are prohibited. Nylon or polyester clothing is prohibited where it may be exposed to fire or excessive heat.

f) Neck ties, hair below the top of the shoulders, dangling necklaces, bracelets, or ear rings must never be worn, and finger rings, including wedding bands are not recommended

in ENVIVA project non-administrative areas.

g) Full-body style safety harnesses, dual shock absorbing fall protection lanyards and devices to attach lanyards to beams, such as beam straps, will be used on ENVIVA projects as described below.

h) Abrasion resistant gloves must be carried by each worker, and worn when handling any sharp or abrasive materials that could cause hand injury. Gloves must not be worn around rotating equipment. All gloves will be provided by the subcontractor to their workers at no cost to the employee.

4) **Fall Prevention/Protection**
a) On all ENVIVA construction projects, 100% fall prevention/protection is required when working more than six (6) feet above the next lowest level, whether through installation of railing systems, use of fall protection harnesses and lanyards, or any other OSHA approved method. On maintenance projects, the fall protection height requirements may be four (4) feet.

b) When erecting or working on steel structures, the preferred method is to pre-install railing systems and other fall protection devices such as life-lines that facilitate tie-off. The first access for initial connection of steel beams should be in a JLG-type bucket lift but it may be conducted by climbing vertical beams if tied-off to a retractable lifeline. Subsequent access to steel for bolt-up must be by personal lifting devices such as stairs, JLG-type bucket lifts, ladders, or

37

scaffolds. When on steel, 100% tie-off is always required when above six feet.

c) When erecting or dismantling scaffolds on a construction site, 100% fall protection is required above six (6) feet. On maintenance sites, fall protection may be required above four feet.

d) Fall protection harnesses must be worn and a retractable lifeline used anytime a worker is climbing or descending on scaffold ladders that are more than fifteen(15) feet above the ground of the next lowest level. The retractable lanyard must be attached to a suitable anchor- point.

e) When working on incomplete scaffolds, such as those that are "Yellow-tagged", 100% tie-off is required.

f) Fall protection harnesses and lanyards must be inspected by user daily and by a competent person monthly.

g) When in JLG-type baskets, fall protection must be worn and all workers tied-off.

h) Roof leading edge protection must be provided when working within six feet of the edge when that edge is more than six (6) feet above the next lowest level.

**FAILURE TO COMPLY WITH FALL PROTECTION CRITERIA (4a – h) ABOVE SHALL RESULT IN IMMEDIATE REMOVAL OF THE VIOLATING EMPLOYEE AND MAY RESULT IN THE TERMINATION OF THE AGREEMENT IN ITS ENTIRETY.**

5) Ladders
   a) Only fiberglass or wooden ladders are allowed on ENVIVA projects. Metal ladders are prohibited.

   b) Extension ladders will be held at the base until tied-off at the top.

   c) Ladders must be inspected before use and an inspection documented by a competent person and each ladder tagged and/or taped monthly.

6) Vehicles and Mobile Equipment
   a) Each Contractor employee must have a valid state driver's license to operate any vehicles or mobile equipment on the project. Contractor employees will be required to show their state driver's license to an ENVIVA representative.

   b) Daily pre-use inspections will be performed on each vehicle or item of mobile equipment. The manufacturer's checklist or equivalent must be used and the documentation retained for review.

   c) All incoming vehicles and mobile equipment must be safety-checked before use and operator training must be documented and available for ENVIVA review upon request.

   d) Installed seat belts will be used by vehicle and equipment operators and passengers, as applicable.

   e) All mobile equipment and other construction vehicles (not cars or pickups with unobstructed rear views) must have operable back-up alarms.

38

f) Any mobile equipment used in an enclosed area such as a basement or warehouse, shall be propane or electric powered.

7) **Environmental Requirements**
   a) Contractor is to provide current Safety Data Sheets (SDS) before any materials/chemicals are brought to the site.

   b) Trash and waste will be policed and properly disposed of in designated containers on a daily basis. Failure to perform this function will result in the contractor being charged for clean up performed by others.

   c) Equipment fluid leaks will be contained and the equipment repaired before continued use.

   d) ENVIVA supervisors and managers must be notified immediately when any chemical or oil spill occurs, no matter how small. Spill control and clean-up will only be accomplished by trained personnel. Contractor may be responsible for costs involved with clean up of spills it causes, under the terms of the Subcontract.

8) **Confined Spaces**
   a) Contractor must provide all of its employees/attendants (hole watchers) who enter confined spaces with rescue and emergency equipment, continuous atmospheric monitoring instruments, respirators, fire extinguishers, and any other equipment required by OSHA or MSHA as appropriate.

   b) All project confined spaces are to be considered "permit-required" and will not be entered unless a permit is reviewed by ENVIVA.

   c) If a Contractor employee enters a permit-required confined space, Contractor must have an on-site trained rescue service available as specified by OSHA, or have arranged for that service from an outside service company. Before bidding, Contractor must check to see if rescue forces will be on hand or otherwise ensure its proposal includes training, equipping, and the standby of rescue personnel for its personnel who may enter permit-required confined spaces.

   d) If ENVIVA personnel are also in the confined space, ENVIVA will conduct continuous atmospheric monitoring. When no ENVIVA personnel are in the space, the Contractor is required to perform initial and continuous atmospheric monitoring.

9) **Excavations**
   a) An excavation permit will be obtained from ENVIVA before digging, no matter the depth of the hole, trench or excavation.

   b) Protective systems such as trench boxes or shoring must be in place in all trenches five feet or more in depth unless benching or sloping in compliance with OSHA Standards is maintained.

   c) All subcontractor employees involved with trenching and excavations must be trained in the associated hazards and precautions.

   d) A competent person must inspect each trench daily prior to worker entry and intermittently during trenching operations.

39



e) Spoil piles must be kept at least three (3) feet back from the edges of a trench.

f) Safe access and egress into and out of trenches according to OSHA requirements must be provided in every case.

## 10) Lifting and Rigging

a) Lifts over 2,000 pounds require completion of a pre-lift checklist form. Lifts meeting critical lift criteria require a critical lift plan. Lifts less than, or equal to, 50% capacity of the lifting equipment require the supervision of a qualified rigger. Lifts greater than 50% capacity of the lifting equipment require the rigging to be completed under the supervision of a qualified rigging superintendent.

b) All rigging will be inspected before use daily and monthly. Monthly inspections will be documented in writing and/or by color-code designation.

c) All crafts must use wire rope slings on all lifts when feasible. Synthetic slings may only be used when it is infeasible to use wire rope slings.

d) Contractor employees will only use rigging softeners that are designed specifically for that purpose. Scrap materials will not be used as softeners on any rigging.

## 11) Miscellaneous Requirements

a) Assured grounding and Ground Fault Circuit Interrupters (GFCI) are required on all electrical equipment and electrical tools and must be furnished by Contractor. If in doubt, ask the project supervisors or safety coordinator at the site.

b) Contractor must use hot work, excavation, confined space, and other permits as required by ENVIVA.

c) Scaffolding will be inspected by qualified persons daily prior to use or for each shift as required and tagged to document "Do Not Use, Incomplete, Complete" and required inspections. If Contractor erects scaffolds, it must have a competent person assigned.

d) Contractor must supply lockout locks for employees. These locks must not be used for other purposes and supervisors must ensure keys are controlled.

e) Compressed air hoses and couplings must be inspected daily before use. All hose couplings must have positive locking devices. Chicago-type fittings must be secured with wire or clips as whip checks.

f) Electrical cords, hoses, and welding leads must be routed overhead when feasible, so as to avoid tripping hazards and damage to the cords, hoses, and leads. Hoses, cords, and leads routed on the ground will be protected from damage caused by vehicles running over them.

g) Electrical equipment cords, including extension cords brought onto the project, must not have cuts, or other defects, and must be free of repairs. Splices completed by a qualified electrician are allowed if the insulation is intact and usage characteristics are the same as a new cord.

40

h) Contractor must ensure that all job-related injuries, illnesses and equipment incidents, no matter how minor, are reported to ENVIVA immediately. An initial written incident report must be submitted within four (4) hours of incident and subsequent complete incident report within twenty-four (24) hours of event. Contractor must submit a weekly report on all occupational injuries and illnesses to ENVIVA's coordinator, including the completed individual injury report form.

i) Toolbox safety meetings must be conducted weekly and must be fully documented with content and attendance. Copies of handouts provided to Contractor's workers are to be given to ENVIVA's Project Coordinator or Safety Coordinator for retention.

j) A Contractor representative must attend ENVIVA-led safety committee meetings.

k) When twenty (20) or more of Contractor's workers are on the job, **or if safety becomes an issue,** Contractor must provide a safety coordinator, approved by ENVIVA as competent, to perform safety responsibilities for the scope and size of the project and, unless waived by the ENVIVA Project Manager, be present on the project during regular working hours.

l) Contractor shall maintain training records for each of its employees on the Project site and will immediately provide those records to ENVIVA upon request.

m) Contractor shall require each work crew to complete an Enviva pre-task Safe Work Permit (SWP). A SWP must be completed prior to each task on each shift.

12) **EVACUATION MAP AND ALARM SIGNALS**
**IT IS THE RESPONSIBILITY OF THE SUBCONTRACTOR TO OBTAIN AND COMMUNICATE TO ITS EMPLOYEES EVACUATION MAPS AND ROUTES OUT OF THEIR WORK AREA AND TO IDENTIFY ALARM SIGNALS AS MAY BE APPLICABLE TO THE PROJECT SITE.**

**Contractor agrees to comply with OSHA, EPA, MSHA, AMSE, Enviva Safety Policies, and the aforementioned requirements.**

41

# Safe Work Permit

**Originator:** _____ **Contractor:** _____ **Date:** _____

**Location of Work:** _____

**Task Description:** _____

**Emergency Phone Number:** _____ ' **Emergency Assembly Point:** _____

1) _____
2) _____
3) _____
4) _____
5) _____

## Resource Planning

| Special Procedures | Materials | Equipment | Special Tools | Permits | Lifts/Scaffolds/Ladders | Other Craft Support |
|---|---|---|---|---|---|---|

**Clean up the work area during the shift. Do not wait until the task is complete.**

## POTENTIAL HAZARDS

| | | | |
|---|---|---|---|
| A Electrocution/Shock | H Heat/Cold Stress | O Airborne Particles | V Housekeeping/STF |
| B Fall From Heights | I Respiratory/Ventilation | P Pinch Points | W Weather / Wind Potential |
| C Work Overhead | J Laceration/Abrasion | Q Fire | X Other |
| D Lifting / Ergonomics | K Mobile Equipment / Traffic | R Restricted Lighting | Y Other |
| E Lifting: Mechanical | L Hot/Cold Surfaces | S Open Excavations | Z Other |
| F Slippery / Uneven Surfaces | M Restricted Access / Egress | T Floor-Wall Holes / Openings | AA Other |
| G Machinery – Rotating | N Noise | U Chemicals / Concrete | BB Other |

## ENTER LETTER OF POTENTIAL HAZARD AND CORRECTIVE ACTIONS FOR EACH JOB STEP

| LETTER: | CORRECTIVE ACTIONS TAKEN TO ENSURE SAFETY (USE REVERSE OF THIS SHEET IF ADDITIONAL SPACE IS NECESSARY): |
|---|---|
| | |
| | |
| | |
| | |
| | |

| Additional Supervisor's Signature: | Time of Review: |
|---|---|

| CREW SIGN-IN BEFORE TASK | CREW SIGN-OUT AFTER TASK |
|---|---|
| **Task Start Time:** | **Task End Time:** |
| I understand the safety precautions and have the training to perform this task incident free. | I have worked safely today and have not been injured. |
| | |
| | |
| | |
| | |

| POST TASK FOLLOW UP: | ☐ Locks Removed | ☐ Rail and/or Roadways Cleared | ☐ Area Clean and Secure |
|---|---|---|---|

| **Supervisor's Name (print):** _____ | Ladder, Fall Protection, Rigging, Fire Extinguisher, and Electrical Equipment Color Code |
|---|---|
| **Supervisor's Signature:** _____ | This Month's Inspection Color Code |

Case 7:16-cv-00306-BO   Document 1-1   Filed 08/24/16   Page 60 of 64

## SAFETY REMINDERS - REVIEW BEFORE STARTING WORK

| FIRE PROTECTION | PPE NEEDED | ENERGIZED EQUIPMENT SECURED | PERMITS NEEDED |
|---|---|---|---|
| Fire Blankets | Face Shield | Ground Fault Protection (GFCI) | ENVIVA Safe Work Permit |
| Welding Screens | Glasses/Goggles | Double Insulated | Hot Work-Spark/Fire |
| Flammables Removed | Hearing Protection | Lockout/Tag Out | Hot Work-Live Electrical |
| Suitable Fire Extinguishers | Gloves For Specific Hazard | Electrical Tool/Cords Inspected | Confined Space Entry |
| LEL Measured | Rubber Boots | High Voltage Lines Identified | Line Break |
| Trained Firewatcher Stationed | Long-Sleeve Shirt | Cords/Leads/Hoses Elevated 7' | Vehicle Entry |
| Cable Trays Cleaned if Needed | Fall Protection Equipment | INSPECTIONS | Roof Access |
| BARRICADES NEEDED | Respiratory Protection | Welding Leads | Demolition |
| Caution (Yellow) | Foot/Metatarsal Guards | Ladders/Scaffolds/Aerial Equipment | Pre-lift Rigging/Critical Lift |
| Danger (Red) | Safety Shower/Eyewash | Rigging/Hoisting Equipment | Excavation |
| Hard Barricade | Burn/Welding Jacket | PERSONAL COMFORT | Personnel Lifting Basket |
| Barricade Tags | Knee Pads | Drinking Water | Rail Work/Blue Flag Derailer |
| Flashing Lights | Electrical Flash Gear | Cooling Fans or Heaters | Other |

Continued From Front Page:

| ENTER LETTER OF POTENTIAL HAZARD AND CORRECTIVE ACTIONS FOR EACH JOB STEP | |
|---|---|
| LETTER: | CORRECTIVE ACTIONS TAKEN TO ENSURE SAFETY: |
| | |
| | |
| | |
| | |

Continued from Front Page:

| CREW SIGN-IN BEFORE TASK | CREW SIGN-OUT AFTER TASK |
|---|---|
| Task Start Time: | Task End Time: |
| I understand the safety precautions and have the training to perform this task incident free. | I have worked safely today and have not been injured. |
| | |
| | |
| | |
| | |

43

Case 7:16-cv-00306-BO   Document 1-1   Filed 08/24/16   Page 61 of 64



Exhibit 9
Form of Change Order

**Sampson Project**
**Scope Change Order [number]**
**[Change Order Title]**

This SCOPE CHANGE ORDER dated this [day] of [month] [year] is between Enviva Pellets Sampson, LLC, 'Owner", and [Contractor], "Contractor" per the terms of the [Agreement] dated as of [Date], the "Agreement". Owner and Contractor may be referred to individually as "Party" and collectively as "Parties".

The Parties hereby agree to change the Agreement as follows:

1. CHANGES TO THE TERMS AND CONDITIONS

2. CONTRACT PRICE MODIFICATION

3. SCOPE OF WORK MODIFICATIONS

4. PERFORMANCE GUARANTEES MODIFICATIONS

5. SCHEDULE MODIFICATION

6. WARRANTY MODIFICATIONS

7. PAYMENT SCHEDULE MODIFICATIONS

Except as specifically set forth herein, all other terms and conditions of the Agreement shall remain in full force and effect. Contractor acknowledges that this is a complete settlement of the entire matter and waives the right to any subsequent claim arising out of this Scope Change Order. Neither this Scope Change Order nor other Scope Change Orders shall have any cumulative effect or impact.

44



Form of Work Order – Enviva Pellets Sampson, LLC

> This Work Order is subject to the terms and conditions of the Construction Services Agreement between Enviva Pellets Sampson, LLC ("Owner") and _____ ("Contractor").

Enviva Legal Entity ("Owner"):   Enviva Pellets Sampson, LLC

Contractor Legal Entity:

Project Identification (title):

Company Representative:

Phone Number / email Address:

Contractor Representative:

Phone Number / email Address

Work start date:

Purchase Order Number:

Lump Sum Fee:
Total Amount: $ _____

Completion date:

Liquidated Damages: _____

SCOPE OF WORK



Enviva Pellets Sampson, LLC                          CONTRACTOR
By Enviva Wilmington Holdings, LLC,
as its sole member

By Enviva Development Holdings, LLC,
as its managing member


By:_____          By:_____

Printed Name:_____          Printed Name:_____

Title:_____           Title:_____

Date:_____           Date:_____


46

IN WITNESS WHEREOF, the authorized representatives of the Parties have executed this Scope Change Order [Number] as set forth below:

Enviva Pellets Sampson, LLC            [CONTRACTOR]

By Enviva Wilmington Holdings, LLC,
as its sole member

By Enviva Development Holdings, LLC,
as its managing member

By: _____      By: _____
Name: _____      Name: _____
Title: _____      Title: _____
Date: _____      Date: _____

45